MRS. RUBY W. PETTY, Widow, EDGAR PETTY, Deceased, Employee v. ASSOCIATED TRANSPORT, INC., Self-Insurer

No. 20

(Filed 15 April 1970)

**1. Master and Servant §§ 47, 58— interpretation of G.S. 97-12 — suicide by employee — objective of Compensation Act**

An interpretation of G.S. 97-12 as prohibiting compensation to the dependents of an employee who intentionally killed himself is not compatible with the objective of the Workmen's Compensation Act, which is to provide for the injured workman, or his dependents in the event of his death, at the cost of the industry which he was serving.

**2. Master and Servant § 47— construction of Compensation Act**

Benefits under the Workmen's Compensation Act should not be denied by a technical, narrow and strict construction.

**3. Master and Servant § 58— workmen's compensation — suicide resulting from compensable accident — intervening act**

When suicide is the end result of an injury sustained in a compensable accident, it is an intervening act but not an intervening cause.

**4. Master and Servant § 58— workmen's compensation — suicide resulting from compensable accident**

An employee who becomes mentally deranged and deprived of normal judgment as the result of a compensable accident and commits suicide in consequence thereof does not act wilfully within the meaning of G.S. 97-12, and his death is compensable under the Compensation Act.

**5. Master and Servant § 97— workmen's compensation — hearing by Commission under misapprehension of the law — remand for necessary finding of fact**

Where a claim for compensation for the death of an employee who committed suicide while totally disabled from a compensable accident was heard and reviewed in the Industrial Commission under the misapprehension that G.S. 97-12 prohibited compensation for the death of an employee who intentionally took his own life, even though his death was directly attributable to the injuries he received in the accident, the cause must be returned to the Industrial Commission for a specific finding whether the employee's suicide was attributable to an abnormal mental condition resulting from the compensable accident, no finding with respect thereto having been made.

**6. Master and Servant § 85— workmen's compensation — rehearing by Industrial Commission**

The Industrial Commission, in a proper case, may grant a rehearing and hear additional evidence.

**7. Master and Servant § 93— workmen's compensation — rulings upon objections to evidence — answers "for the record"**

Ordinarily, when objection is made to a question propounded to a witness in a workmen's compensation hearing, the proper procedure is for

the commissioner to require counsel to state the grounds of objection and then to make his ruling; when a ruling is deferred and the witness is allowed to answer "for the record," the ruling should be entered in the transcript before the hearing commissioner makes his award.

**8. Master and Servant § 93— workmen's compensation — suicide — causal relation to accident — hypothetical questions — expert testimony**

In this proceeding upon a claim for compensation for the death of an employee who committed suicide while totally disabled from a compensable accident, doctor's answers "for the record" to hypothetical questions seeking to establish a direct causal relation between the employee's accident and suicide were competent.

MOORE, J., did not participate in the consideration or decision of this case.

ON certiorari to review the decision of the Court of Appeals reported in 4 N.C. App. 361, 167 S.E. 2d 38, docketed and argued in the Supreme Court as Case No. 20 at the Fall Term 1969.

Plaintiff, the widow and sole dependent of Edgar Petty (Petty), instituted this proceeding before the North Carolina Industrial Commission to recover death benefits under G.S. 97-38. On 13 February 1966 Petty (57) was working for defendant, a self-insurer, as an over-the-road truck driver. On that day he was injured on the highway in Maryland in an accident arising out of and in the course of his employment. On 8 July 1966 he committed suicide. Plaintiff contends that the suicidal act was causally related to the accident and that she is therefore entitled to compensation.

The first hearing in this case was held by Commissioner William F. Marshall, Jr., on 3 April 1967. The second was conducted on 1 April 1968 by Deputy Commissioner Robert F. Thomas. The only evidence adduced by defendant was the medical reports of the surgeon who treated Petty in Maryland. The testimony of plaintiff's witnesses tended to show the following facts:

Plaintiff's co-driver, J. W. Walker, was driving the truck when a two-pound hunk of concrete hurtled from an overhead bridge into the bunk where Petty was resting. Walker stopped the truck and observed that Petty was bloody and unconscious, "the rock laying up beside his head." He "waived down traffic to get some help," and in about 30 minutes an ambulance took Petty to Prince George General Hospital at Cheverly, Maryland, where he was treated by Dr. Dunn Kavanaugh.

The rock had fractured Petty's right cheek and shattered his jawbone. There were three complete fractures of the mandible and "a

fracture of the remaining portion of the alveolus on the right maxilla, which contained two molar teeth." Dr. Kavanaugh attempted to reduce the fracture by drilling holes in the bones and wiring them together. He also placed wires around the teeth and applied arch bars to the upper and lower arches with wire around each of the solid teeth.

On 22 February 1966, after nine days in the Maryland hospital, Petty was permitted to return to North Carolina for follow-up care. His personal physician, Dr. Matthews of Burlington, saw him on 24 February 1966 and immediately referred him to Dr. Erle E. Peacock, Jr., of North Carolina Memorial Hospital at Chapel Hill. Dr. Peacock examined Petty on 1 March 1966 and found "an unstable nonunion of a fracture of the symphysis of the mandible." Dr. Peacock attempted to stabilize the jaw without surgery by driving Kirschner wires across the fragments. However, this procedure was unsuccessful. On 11 April 1966, he operated and found the cause of the instability to be "a large butterfly fragment" and two lateral fragments which were barely touching each other. He drilled opposing holes on each side of the loose fragments and in the lateral processes, and wired them together tightly. Arch bars were placed on both dental arches by fastening them to the teeth with steel wires. The wires were removed on 17 April 1966, and Petty was discharged from North Carolina Memorial Hospital.

As long as Petty's jaws were wired he could not talk normally, and he could take nourishment only through a quill. Between the date of the accident and his death he lost forty pounds. All the while his jawbone was wired (32 days) he suffered pain from muscular spasms in his face, neck, and jaw. One of his multiple discomforts was that he could not complete a yawn. After the wires were removed, he complained of "a novocain numbness" of the lower lip and jaw. This, the doctor told him, "might last for several years or it could go away." Dr. Peacock's operation corrected the nonunion of the bone fragments and the instability of the jaw. However, Petty's appearance was not the same as it had been before the accident. His teeth did not meet right; his jaw jutted; and his eyes were "not right." He continued to have trouble talking, and he could not open his mouth normally. His teeth were still braced, and within 2-3 days after his return from Chapel Hill the braces set up muscular spasms which seemed to him to be pulling his teeth apart where they were wired. He became apprehensive that damage was being done to the bone. Five or six of his teeth were loose. He had no bite, and he could not chew even soft food. During the last two weeks of his life, Petty had no appetite and could not sleep.

Prior to 13 February 1966, according to Petty's neighbors, associates, and family, he was a happy, healthy, well-adjusted man, who enjoyed fishing, fish frys, cook-outs, and keeping his yard. He was friendly, poised, and assured, a devoted husband and father, and a loving grandparent. His minister characterized him as "a wonderful person." Petty's home in Elon College was paid for; "he had money in the bank" and no debts. On 28 February 1966 he became eligible for retirement at $250.00 a month for life. Before the accident Petty had manifested no symptoms of mental illness. After the accident, however, his personality changed; "he was never himself thereafter."

Early in March, after Dr. Peacock started treating him, Petty became upset because he felt that Dr. Peacock was too busy to take a personal interest in his case. However, he "calmed down" when Dr. Matthews told him that Dr. Peacock was "the best qualified man in the whole area" to treat his injury. Later Petty said he was glad he had not changed doctors. Dr. Peacock told Petty that he was unduly concerned about himself, and his wife and daughter felt that this was "the kind of talk" he needed to hear. After the first of March, Petty was definitely anxious, nervous, and showed signs of depression. His family noted that his thinking and comprehension "was slowed." He did not always understand what was said to him, and he was forgetful. He was concerned only with his physical feelings, and he did not want his grandchildren around for fear they would hurt him. His eyes did not seem to focus, and at times he would stare vacantly. It was Dr. Matthews' opinion that Petty's accident would have had an emotional effect on anybody.

Petty dreaded the operation on April 11th, his second, and there was a marked change in his condition thereafter. His depression and nervousness worsened. He would pace the floor of his room and the hospital corridor or stare out of his window and cry. He continued to do this after he came home from the hospital on April 17th.

Sometime in May, Petty apparently realized that he was mentally ill. He told his minister, Mr. Ben Cox, that he knew something was wrong with him; that he had feelings of hostility toward total strangers; that while sitting on a bench in the city park, he had wanted to throw something at a child who rode by on a bicycle. Mr. Cox had advised him to go to the mental-health clinic.

The last of May, Petty went to the office of his sister-in-law, Mrs. Webster, a nurse with the Alamance County Health Department, and told her that he constantly had "feelings of confusion in his head," a "feeling of pressure and blurred vision," and "a feeling of something closing in on him." He told her he was thinking of killing his

wife and her mother. When she asked him if he had told his wife about these feelings he wept and said she was "dearest of all to him," and he could not discuss the situation with her lest she become afraid of him. As he talked, his eyes did not focus. He told Mrs. Webster he wanted help; that he had talked to Mr. Cox; and that he was willing to consult a psychiatrist. At his request she went to the Petty home that night to help him tell his wife of these "strange feelings" and of his fear that he might harm her, her mother, and the colored maid. Mrs. Petty assured him that she had no fear he would ever harm her and that they would seek help immediately.

The next morning Petty and his wife went to see Dr. Matthews. Petty was reluctant to disclose the details of his feelings to the doctor but managed to tell him that he had the urge to harm the occupants of his house and that this frightened him. It was obvious to Dr. Matthews that Petty's reasoning power was disturbed, and he arranged for Petty to see Dr. Fox at the mental clinic that afternoon.

Dr. Fox saw Petty on June 2nd and 9th. Dr. W. D. Clarkson, the director of the mental-health clinic, saw him on June 22nd. Dr. Clarkson thought Petty was "repressing," for he could get very little out of him. The doctor was concerned for him and troubled by "what he didn't say." He told Petty to return on June 29th with his wife.

Petty did not tell his wife Dr. Clarkson wanted to see her. On June 29th Petty cancelled his appointment and went to Durham to see his mother-in-law. After learning of Petty's urge to do harm, his wife had sent her there to stay with another daughter. When he arrived about 10:30 a.m. his face was red and his eyes wild. He told his mother-in-law that he had started to Butner but decided to come by and tell her he was going to kill his wife and himself, that he was in a fog and could not get out. She talked with him until 2:30 when he appeared to be quiet and said he wanted to go back home. She immediately telephoned her daughter and informed her of Petty's agitated state.

Despite the urge to harm his wife, Petty was always kind to her. At no time after his accident did he ever speak crossly to her or manifest irritability toward her. Nor did he ever complain about the liquid diet which she prepared for him.

On 8 July 1966 Dr. Cadell, a dentist, was scheduled to begin procedures calculated to correct Petty's dental problems. Petty had told his wife that he did not believe he would ever have the nerve "to go through with that dental work." On the afternoon of July 7th,

the day before his first scheduled appointment with the dentist, Petty went to the home of a policeman, a friend to whom he had loaned his pistol, and repossessed the weapon. On the following morning, after his wife went to work, a neighbor saw him take a bag from his car into the house. When Mrs. Petty came in from work that afternoon she found his body on the floor of his bedroom. He had shot himself with the pistol he had procured the day before.

As a result of the accident on 3 February 1966, Petty was completely and totally disabled until his death on 8 July 1966. However, Dr. Matthews thought he would have sufficiently recovered from his injury to have returned to work within 30 days had the dental work proceeded according to plan.

In Dr. Clarkson's opinion, the injury which Petty received in Maryland on 13 February 1966 could have contributed to the mental condition he observed on 22 June 1966. At that time Petty was anxious, severely depressed, and paced the floor. Dr. Clarkson described his condition as an "agitated depression" or "involutional psychotic depression." Such depression in a man of Petty's age, he said, indicated a "high likelihood of suicide," and "he would assume that his death on July 8 was related to his depression." It was also Dr. Clarkson's opinion that if Petty suffered great pain it could have contributed to an emotional condition such as depression, particularly if the pain was chronic, and he saw no end or solution to it. Dr. Clarkson also said that if Petty was unconscious after the accident — as Walker testified — the assumption is that he had suffered a concussion of the brain, and the presence of some brain injury could not be ruled out. However, he found in the hospital records "no gross evidence" of brain damage.

On 15 May 1968, Commissioner Marshall filed his opinion and award. *Inter alia* he found:

"(6) . . . All evdientiary medical records and all medical evidence points to the fact that plaintiff (*sic*) did not suffer any brain injury in the accident; that the deceased employee knew the nature and extent of his surroundings and that the depression experienced was the normal reaction to the nature and length of time of recovery for the accident and subsequent operation, . . . (7) that there is no causal relationship between the self-inflicted injuries resulting in death on July 7, 1966 (*sic*), and the industrial injury sustained on February 13, 1966." His conclusion of law was that "[t]here is no causal relationship shown connecting the admitted industrial accident of February 13, 1966, and the self-inflicted injuries resulting in

death on July 7, 1966." He denied plaintiff's claim for death benefits, and she appealed to the full Commission.

Upon appeal the full Commission concluded that Commissioner Marshall had reached the correct result but for the wrong reason; that the decision should rest on "G. S. 97-12 concerning the willful intention of the employee to kill himself, rather than upon the basis of causal relationship." It struck out Finding of Fact No. 7 and substituted therefor the following: "7. The deceased employee shot himself to death with his own pistol . . . deceased having obtained such pistol (on the preceding day) from a policeman to whom he had loaned it. . . . The death of deceased employee was occasioned by his willful and premeditated intention to kill himself." Upon this finding it substituted for Marshall's conclusion of law the following: "The death of the deceased employee was occasioned by the willful and premeditated intention of the employee to kill himself. The plaintiff is therefore not entitled to compensation. G. S. 97-12; cf. *Painter v. Mead*, 258 N.C. 741."

From the award of the full Commission, plaintiff appealed to the Court of Appeals, which found "No error." We allowed certiorari.

*John H. Vernon and W. R. Dalton, Jr., for plaintiff appellant.*

*Jordan, Wright, Nichols, Caffrey & Hill by Luke Wright and Edward L. Murrelle for defendant appellee.*

SHARP, J.

The opinion and award of the full Commission, which struck Commissioner Marshall's finding that there was no causal relation between Petty's suicide and the accident on 13 February 1966, discloses: (1) As to the facts, the Commission was convinced that Petty intentionally took his own life, but that his death was directly attributable to the injuries he received in the accident. (2) As to the law, upon these facts, the Commission thought G. S. 97-12 denied to plaintiff any compensation for Petty's death.

G. S. 97-12, in pertinent part, provides: "No compensation shall be payable if the injury or death was occasioned by the . . . willful intention of the employee to injure or kill himself or another." Plaintiff's assignments of error raise this question: Does an employee who intentionally takes his own life because of a mental derangement produced by a compensable injury act *willfully* within the meaning of G.S. 97-12?

Prior to *Painter v. Mead Corporation*, 258 N.C. 741, 129 S.E. 2d

482 (1963), this Court had not passed upon a claim for compensation for the death of an employee who committed suicide while totally disabled from a compensable accident. In that case, the deceased employee suffered a blow to his head in an accident arising out of and in the course of his employment. Headaches of increasing intensity followed, and twenty days later a cranial operation was performed to relieve pressure on the brain. Thereafter he was never himself; he was the victim of headaches, sleeplessness, emotional instability, and periods of blankness. On the morning of 2 September 1960, after a sleepless night, Painter hung himself. A psychiatrist testified that, in his opinion, Painter was so depressed, upset, and bereaved of judgment as a result of his head injury that he would be considered insane; in committing suicide he was dominated by a disturbance of mind directly caused by the injury and its consequences; and, "in that sense," his act was involuntary. The hearing commissioner found the following facts, which the full Commission adopted:

"That the accidental injury of deceased employee, Tolvin Edgar Painter, on July 21, 1960, caused the deceased to become insane and mentally deranged to such an extent that he had an uncontrollable and irresistible impulse to such an extent that he become delirious and frenzied without rational knowledge of the physical consequences of his act, without conscious volition to produce death on September 2, 1960."

In using the foregoing words to express its finding in *Painter's* case, the Commission was obviously paraphrasing the *"Sponatski* rule," formulated in 1915 by the Supreme Judicial Court of Massachusetts in *In Re Sponatski*, 220 Mass. 526, 108 N.E. 466. In that case the court said that under the Workmen's Compensation Act the right of dependents of a mentally disturbed employee to recover compensation for his death by suicide was determined by the following rule:

". . . [W]here there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled

by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury." *Id.* at .530, 108 N.E. at 468. (In 1958 Massachusetts rejected the *Sponatski* rule by legislation. Mass. Gen. Laws Ann. Ch. 152, § 26(A), (1958).)

Thereafter, for many years, the majority of American courts deciding the question here presented followed the *Sponatski*·rule, or at least gave it lip service. *Painter v. Mead Corporation, supra* at 747; 1A Larson's Workmen's Compensation Laws § 36.20 (1967); Annot., Suicide as Compensable Under Workmen's Compensation Acts, 15 A.L.R. 3d 616; Comment, 31 U. of Cinn. L. Rev. 187.

In effect that rule incorporates the M'Naghten test for criminal responsibility. Under M'Naghten, if the accused should be in such a state of mental derangement as not to know the nature and quality of the act he was doing, or, if he did know it, as not to know he was doing wrong, the law does not hold him accountable for his acts, for guilt arises from volition and not from a diseased mind. *State v. Spence,* 271 N.C. 23, 38-39, 155 S.E. 2d 802, 814. Also it should be noted that the *Sponatski* rule was predicated upon the tort concept of an independent intervening cause. It eliminates the accident as the proximate cause of death if the employee had sufficient mental capacity to know the purpose and effect of his suicidal act notwithstanding he was dominated by a disordered mind directly caused by the injury and its consequences.

At the time we decided *Painter,* the *Sponatski* rule was still the majority rule. However, in writing the Court's opinion, which affirmed an award to Painter's dependents, Higgins, J., noted: (1) *Sponatski's* is a harsh rule which has been widely criticized as "an application of the test of criminal responsibility not justified in workmen's compensation cases" and as confusing "an intervening *act* with an intervening *cause"*; and (2) a growing minority of jurisdictions in this country are holding that the death of an employee is compensable if a work-connected injury causes insanity which in turn induces suicide. In *Painter* it was carefully pointed out that in affirming the Commission's award, we were not to be understood "as fixing as our standard the rigid rule of the *Sponatski* case"; we merely held that the evidence met *Sponatski* requirements, the most stringent of all tests, and that further discussion was therefore unnecessary. *See* Case Law Comment, 42 N. C. L. Rev. 611.

**[1, 2]**   Despite our intimation in *Painter,* however, the Commission cited that case in support of its conclusion that G. S. 97-12 prohibited compensation to the dependents of an employee who intentionally killed himself. We do not think such an interpretation is

compatible with the objective of the Workmen's Compensation Act, which is to provide for the injured workman, or his dependents in the event of his death, at the cost of the industry which he was serving. To this end, the rule is that benefits under the Act "should not be denied by a technical, narrow, and strict construction." *Hollman v. City of Raleigh,* 273 N.C. 240, 252, 159 S.E. 2d 874, 882. *Accord, Cates v. Construction Co.,* 267 N.C. 560, 148 S.E. 2d 604; *Hartley v. Prison Department,* 258 N.C. 287, 128 S.E. 2d 598; *see* Comment in 45 Iowa Law Rev. 669 (1960).

[3]   To say, as a matter of law, that one who intentionally takes his own life acts willfully is to ignore "the role which pain or despair may play in breaking down a rational, mental process. *Harper v. Industrial Commission,* 24 Ill. 2d 103, 107, 180 N.E. 2d 480, 482. Annot., 15 A. L. R. 3d 616, 622. "If the sole motivation controlling the will of the employee when he knowingly decides to kill himself is the pain and despair caused by the injury, and if the will itself is deranged and disordered by these consequences of the injury, then it seems wrong to say that this exercise of will is 'independent,' or that it breaks the chain of causation. Rather, it seems to be in the direct line of causation." 1A Larson's Workmen's Compensation Law § 36.30 (1967); Annot., 15 A. L. R. 3d 616, 622. As Fowler, J., pointed out in his dissent in *Barber v. Industrial Commission,* 241 Wis. 462, 6 N.W. 2d 199 (1942) (a decision which applied *Sponatski*), when suicide is the "end result" of an injury sustained in a compensable accident, it is "an intervening act but not an intervening cause. An intervening cause is one occurring entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is a cause of that result."

In 1949 the Supreme Court of Florida adopted the chain-of-causation test. *Whitehead v. Keene Roofing Co.,* 43 So. 2d 464 (Fla. 1949). *See* Comment in 16 Vanderbilt L. Rev. 275 (1960). *Whitehead* involved facts and a statute practically identical with those we now consider. Whitehead, an employee, sustained serious injuries in a compensable accident. Three months thereafter he committed suicide by swallowing poison. He knew the consequences of his act, but at the time he was suffering from a mental disturbance directly attributable to the injuries he received in the accident. The Florida Act provided: "No compensation shall be payable if the injury was occasioned primarily . . . by the willful intention of the employee to injure or kill himself." In reversing the Circuit Court's judgment denying death benefits to Whitehead's dependents, the Florida Supreme Court said:

"From the evidence, there can be no doubt that the death of the deceased was directly attributable to the injuries he sustained in the fall from the roof. . . .

"[W]e are not persuaded that the fact that a workman knew that he was inflicting upon himself a mortal wound will, in all cases, amount to a 'willful intention' to kill himself, within the meaning of the statute. We believe that in those cases where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered 'willful' within the meaning and intent of the Act. . . .

"While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide. . . ." *Id.* at 465.

Other jurisdictions having statutes which prohibit compensation for willfully inflicted injuries and death have followed the "realistic and reasonable view" of the Florida Court in *Whitehead, supra.*

In *Burnight v. Industrial Acc. Com.,* 181 Cal. App. 2d 816, 821, 5 Cal. Rptr. 786, 790, Bray, P.J., said: "[S]uicide cannot be intentionally self-inflicted if, in spite of his act being one of conscious volition, the suicide, because of mental condition resulting from the injury, is unable to control the impulse to kill himself. . . ."

Twenty-six years after the decision in *Barber, supra,* the dissent of Fowler, J., became the law in Wisconsin. In *Brenne v. Department of Industry, Labor & Hum. Rel.,* 38 Wis. 2d 84, 156 N.W. 2d 497, a lineman received a severe electrical shock in the course of his employment and suffered multiple burns to various parts of his body. Thereafter he committed suicide. The hearing examiner, relying upon *Barber* and the Wisconsin Act allowing recovery only "where the injury is not intentionally self-inflicted," denied plaintiff's claim for direct benefits. In remanding the case to the Department for reconsideration and further hearing, the Supreme Court of Wisconsin (citing *Whitehead v. Keene Roofing Co., supra*), said: "The burden of proof is on the claimant to establish by substantial evidence that the 'chain-of-causation' exists. The claimant does this by showing that the industrial injury caused the suicide. . . .

". . . The act of suicide cannot then be said to be willful or intentional within the meaning of the statute since its causation ultimately relates back to the original injury, rather than existing as an independent and intervening cause." *Accord, Graver Tank &*

*Mfg. Co. v. Industrial Comm.,* 97 Ariz. 256, 399 P. 2d 664 (1965). *Terminal Shipping Co. v. Traynor,* 243 F. Supp. 915 (1965). *See* Annot., 15 A. L. R. 3d 616, 631-637 (1965) and 29 N. A. C. C. A. Law Journal 212, 216-219 (1963), where the cases adopting the chain-of-causation test are collected. Another perceptive argument for the rejection of the *Sponatski* rule and the adoption of the chain-of-causation test appears in the following comment in 45 Iowa L. Rev. 669 (1960):

"In spite of the fact that the majority rule (*Sponatski*) is a departure from the conventional rules of causation, the plain wording of the wilful self-injury statutes appears at first glance to be a convincing argument for the rule's adoption. It might seem that the lack of conscious volition which is the basis of that rule is quite in accord with these statutory limitations. An examination of the purpose to be served by these statutes, however, would indicate that their application is inappropriate in cases of this type. As has been pointed out the law of workmen's compensation does not, at the time of the initial injury, employ the common-law concepts of legal cause in determining liability. Work-connection rather than fault underlies recovery. This absence of the traditional safeguards of the common law may necessitate these statutory safeguards when the level of inquiry is the primary source of injury. Certainly, however, there is no reason for these statutes to be applied in determining the range of compensable consequences stemming *from* the initial injury. Here the employer and his insurer are protected by the common-law concepts of causation which will prevent recovery for additional self-injury which is not connected with the employment. Using the statute to deny compensation for suicides arising out of the employment is anomalous because to do so produces a narrower basis for recovery under the remedial workmen's compensation acts than would have been possible under common-law tort doctrine." *Id.* at 675-676.

[4]　　We conclude that the chain-of-causation test effectuates the purpose and intent of the Workmen's Compensation Act. We hold, therefore, that an employee who becomes mentally deranged and deprived of normal judgment as the result of a compensable accident and commits suicide in consequence does not act wilfully within the meaning of G. S. 97-12.

The evidence in this case tends to show that Petty's death was directly attributable to the accident on 13 February 1966, in that the agitated depression resulting from the accident caused his suicide. This, it seems, the full Commission recognized when it struck Commissioner Marshall's finding that there was no causal relation be-

tween the accident and death. The Commission's belief that, because Petty planned his own destruction causation was immaterial, no doubt explains its failure to make a specific finding with reference to causation.

The transcript does not support Commissioner Marshall's findings (contained in No. 6) that "*all* evidentiary medical records and *all* medical evidence points to the fact that plaintiff (sic) did not suffer any brain injury in the accident . . . and that the depression experienced was the normal reaction to the nature and length of time of recovery for the accident and subsequent operation . . ." (Italics ours.) The record contains evidence to the contrary. Although we do not regard the finding that Petty did not suffer any physical injury to his brain as being determinative of whether his agitated depression was related to his injuries, there is evidence that he was unconscious after the accident and that he had a concussion of the brain. The commissioner's finding that Petty's depression was "the natural reaction" to his injury and subsequent operations ignores certain statements in the testimony of each of the three doctors.

**[5, 6]**  It is clear that this proceeding has been heard and reviewed upon a misapprehension of the applicable principle of law. The opinion and award of the Commission is vacated and the cause is remanded to the Court of Appeals with directions that it be returned to the Industrial Commission, the only tribunal which can find the facts, for a specific finding whether Petty's suicide was attributable to an abnormal mental condition resulting from his accident on 13 February 1966. "[W]here facts are found or where the Commission fails to find facts under a misapprehension of law, the court will, when the ends of justice require, remand the cause so that the evidence may be considered in its true legal light." *Bailey v. Department of Mental Health*, 272 N.C. 680, 684, 159 S.E. 2d 28, 31. "Furthermore, the Industrial Commission, *in a proper case*, may grant a rehearing and hear additional evidence." *Id.* at 686, 159 S.E. 2d at 32.

**[7]**  In view of the manner in which objections to Dr. Clarkson's testimony were handled at the second hearing, it would seem that, upon the request of either party, the Commission should reopen the case to permit his re-examination. We note, however, that on the first hearing Dr. Clarkson gave evidence similar to much of that sought to be adduced by the hypothetical question. When defendant objected to questions propounded by plaintiff's counsel to Dr. Clarkson, the hearing commissioner deferred his ruling and instructed the doctor to answer "for the record." The deferred rulings, however,

were never entered in the record. Obviously this *modus operandi* is unsatisfactory. Ordinarily, the proper procedure is for the commissioner to require counsel to state the grounds of objection and then to make his ruling. If there is a valid objection to the form of the question, counsel can rephrase it; if the objection is made on other grounds, the Commission and opposing counsel are alerted to the legal principle invoked and can appraise it. In any event, when a ruling is deferred it should be entered in the transcript before the hearing commissioner makes his award. Only in this way can the parties, the full Commission, and the court (if there is an appeal) intelligently review the decision. Apparently the full Commission failed to enter rulings on the evidence because of its interpretation of G. S. 97-12.

In justice to the hearing commissioner we are compelled to say that he probably felt driven to the procedure he adopted by the hypothetical question which plaintiff's counsel propounded. Seemingly it was articulated on the spur of the moment and, like Topsy, it just grew. Its form changed as the objections and pages multiplied and confusion became worse confounded.

**[8]** All the testimony of the lay witnesses tended to establish a direct causal relation between Petty's accident and suicide. The purpose of the hypothetical question was to establish this relationship by expert testimony also. By and large, the doctor's "answers for the record" were competent, and the testimony could be properly elicited.

Reversed and remanded.

MOORE, J., did not participate in the consideration or decision of this case.