The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
* * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. The parties are subject to and bound by the Workers' Compensation Act. The employer-employee relationship existed between the plaintiff and the defendant-employer on August 6, 1992.
2. Plaintiff's average weekly wage on August 6, 1992 was $673.20.
3. On August 6, 1992 the plaintiff sustained a self-inflicted injury when he shot himself in the head with an air-powered nail gun.
* * * * * * * * * * * * * *
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff is a 46-year-old married male. He has two adult children, one of which still lives at home.
2. Plaintiff began work for defendant-employer in 1965. Except for a two-year stint in the military from 1966 through 1968, plaintiff was employed by defendant-employer until August 6, 1992.
3. Plaintiff started out as a helper with defendant and eventually worked his way up to the position of supervisor of the erection floor in January 1992.
4. Defendant-employer manufactures commercial drying equipment. Defendant-employer had lost a share of the market in commercial dryers and set out to regain its share of the market in 1992. Part of that effort included shipping machinery on a timely basis. Many of the dryers were scheduled to be shipped to other countries. Missed shipment dates create serious problems for defendant-employer because it may cause substantial delays and financial problems.
5. Plaintiff became supervisor of the erection floor in January 1992 after the previous supervisor, Jim Harrison, died of a heart attack in December 1991. Plaintiff worked as assistant supervisor to Harrison for 10 years.
6. Between January 1992 and August 6, 1992 plaintiff was not only responsible for training a new assistant supervisor but also in assisting Greg Flora to learn his position. Greg Flora was hired in October 1991 as superintendent over several departments, including the erection floor. During this period of time, Greg Flora was constantly interrupting plaintiff by asking him questions and demanding that a particular job be completed by a given date. Additionally, plaintiff would receive phone calls at home on a consistent basis from either the second shift erection floor supervisor or Greg Flora.
7. In June 1992, defendant-employer reduced its work force. Included in that lay-off was the second shift supervisor over the erection floor.
8. Plaintiff had a good working relationship with the employees he supervised. He considered each one of them as good friends.
9. During the week of August 6, 1992 there was an inspection coming up for which plaintiff's department was not ready. Also, there was a piece of machinery scheduled to be shipped to South America that was either on deadline or past deadline on August 6.
10. Plaintiff's department was responsible for the assembly and shipping of the dryers in a timely fashion.
11. In May 1992 plaintiff's daughter had a child out of wedlock. While plaintiff was not fond of the child's father, he loved his grandchild.
12. Plaintiff described himself as a "workaholic." He is a perfectionist who is very particular about his work. Plaintiff has high standards for himself and is more concerned with quality than quantity of work produced.
13. On the morning of August 6, 1992 plaintiff went to his desk, wrote a suicide note, placed his company keys on the desk, went outside of the building, took an air-powered nail gun and shot himself in the head.
14. After the suicide attempt, the plant superintendent found the note on plaintiff's desk which read as follows: "Maybe everyone at P S can do it the way they want to and when also. Here is my keys and twenty-five cents call someone that gives a f. . . ."
15. Grover Waller is a close friend and neighbor of plaintiff. In June 1992 he noticed a change in the personality of plaintiff. He became more reserved and withdrawn. While on vacation in June plaintiff would keep to himself and go to bed early. Between June and August 1992, plaintiff would get upset when he talked about his job. He was afraid he was going to be fired.
16. There was a meeting of supervisors on Monday, August 3, 1992. At that meeting it was implied that plaintiff would be fired if a particular job was not completed by August 6, 1992.
17. Between January 1992 and August 1992, plaintiff was having no marital, financial, physical or substance abuse problems.
18. Dr. Catherine Clodfelter is an expert in the field of clinical psychology. She is a staff psychologist on the Traumatic Brain Injury Unit of Forsyth Memorial Hospital. During her tenure at the hospital she has treated several hundred patients who have sustained either accident or self-inflicted brain injuries.
19. Dr. Clodfelter treated plaintiff on both an in-patient and out-patient basis. After initial refusal to discuss the suicide attempt, plaintiff finally agreed to cooperate with Dr. Clodfelter in June 1993.
20. Dr. Clodfelter found nothing in his early childhood, adolescence, or military service that would have contributed to the suicide attempt on August 6, 1992.
21. Plaintiff informed Dr. Clodfelter that he felt a strong degree of loyalty toward defendant-employer. He worked long hours and would receive frequent telephone calls about his job. He felt strong feelings of comradeship with his fellow employees, especially Jim Harrison. Plaintiff felt that the management of defendant was destroying the company and he could not stop it.
22. Plaintiff also discussed with Dr. Clodfelter a meeting with management immediately prior to August 6, 1992 wherein he advised his supervisors that it was impossible to accomplish what they were asking. He was then informed that he could be replaced if he could not do the job.
23. In Dr. Clodfelter's opinion, plaintiff's employment was a significant causal factor in plaintiff's emotional state at the time of the suicide attempt and exposed him to a greater risk of developing suicidal tendencies than the public generally.
24. Dr. Clodfelter did not assign a psychological diagnosis to plaintiff's emotional state at or before the suicide attempt.
25. Dr. Joseph Weiss is an expert in the field of adult psychiatry. He has not treated or examined plaintiff.
26. In Dr. Weiss' opinion plaintiff suffered from a compulsive personality characterized by perfectionist thinking, intolerance for change and a need for control. A person with plaintiff's personality characteristics is more susceptible to depression. Dr. Weiss described plaintiff as a very responsible person who would tend to have a greater reaction to what was happening in his life. Also, he would be inclined to take deadlines very seriously. In Dr. Weiss' opinion plaintiff's suicide attempt was impulsive, unpredictable and unintentional. Dr. Weiss did not assign a specific psychiatric diagnosis to plaintiff's emotional state at the time of the suicide attempt.
27. The Full Commission gives greater weight to the testimony of Dr. Clodfelter than that of Dr. Weiss in finding that plaintiff's injuries were not the result of his willful intention to injure or kill himself, but his employment was a significant causal factor in the development of plaintiff's depressed mental state at the time of the suicide attempt on August 6, 1992.
28. Plaintiff's employment with defendant-employer subjected him to an increased risk of developing a depressed mental state which led to the suicide attempt than the public generally.
29. Plaintiff's weekly wage on August 6, 1992 was $673.20.
* * * * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's injury was not caused by his willful intention to kill himself because plaintiff was deprived of normal judgment and initially deranged at the time. N.C.G.S. § 97-12(3);Petty v. Associated Transport, 276 N.C. 417, 173 S.E.2d 321
(1979).
2. In order to prevail, the plaintiff must first establish the existence of an occupational disease, and he must then establish that the disease caused him to become mentally deranged and deprived of his normal judgment, resulting in the suicide attempt. The burden of proving each and every element of compensability is on the plaintiff. Therefore, plaintiff suffers from an occupational disease, in that, work-related stress caused or significantly contributed to his emotional state of distress which magnified his pre-existing compulsive and perfectionist personality. In addition, plaintiff's employment with defendant-employer subjected him to an increased risk as compared to the general public of developing a distressed and depressed mental state, which resulted in his attempted suicide. Harvey v.Raleigh Police Department, 96 N.C. App. 28, 384 S.E.2d 549, 553
(1989).
3. Plaintiff has an occupational disease in that he suffers from emotional and physical disabilities causally connected to the stress caused by his employment as a supervisor. N.C.G.S. § 97-53(13); See, Harvey v. Raleigh Police Department, 85 N.C. App. 540,355 S.E.2d 147 (1987); Cross v. Blue Cross/Blue Shield,104 N.C. App. 284, 409 S.E.2d 103 (1991).
* * * * * * * * * * * * * *
Based upon the findings of fact and conclusions of law, the Full Commission reverses the finding of the Deputy Commissioner and enters the following
AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation benefits beginning August 6, 1992 at the rate of $449.07 per week until he no longer remains temporarily disabled, becomes gainfully employed or is otherwise ordered by the Industrial Commission. That compensation which has already accrued shall be paid in a lump sum. This compensation is subject to a reasonable attorney fee hereinafter awarded.
2. Defendant shall pay all past, present and future medical expenses resulting from said occupational disease when the same have been submitted to the Industrial Commission by defendant and approved by the Commission.
3. A reasonable attorney fee of twenty-five (25) percent of the accrued compensation due plaintiff herein is approved for plaintiff's counsel and thereafter plaintiff's counsel shall receive every fourth check. Said attorney's fee shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall bear the costs.
FOR THE FULL COMMISSION
 S/ _______________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ _______________________ THOMAS J. BOLCH COMMISSIONER
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/mj 7/12/95