* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between the named employee and named employer.
3. The employer's workers' compensation insurance with Wausau Insurance Companies took effect on July 1, 2003.
4. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 — Pre-Trial Agreement and Plaintiff's Medical Records
 b. Stipulated Exhibit #2 — Industrial Commission Forms
 c. Stipulated Exhibit #3 — Discovery Responses
5. Issues for determination include:
 a. The compensability of employee's occupational disease, and a determination of all compensation due;
 b. Whether continued sewing is suitable employment for the employee;
 c. Whether defendants are responsible for the employee's continuing income loss;
 d. Whether employee should be provided an accurate job video;
 e. Is employee's claim barred by the settlement in IC File Numbers 311312 and 239784?
 f. The applicable average weekly wage and if benefits are determined to be owed.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff was born September 24, 1945, and was 59 years old at the time of the hearing of this matter before the Deputy Commissioner. Plaintiff completed the sixth grade and does not have a GED.
2. Plaintiff had been employed as an upholstery sewer with the Defendant-Employer for eighteen years. Plaintiff's job duties as an upholstery sewer with the Defendant-Employer included sewing backs and seat cushions for couches, loveseats, and chairs. She sewed the ends of the seat, the arms and then the backs. The job was a sit down job. Plaintiff used an industrial sewing machine, and she used her hands to run the material through the sewing machine. Her hands were in contact with the machine to guide the fabric through the machine.
3. On or about May 20, 2002, Plaintiff sustained an injury by accident (I.C. File Number 239784) arising out of and in the course and scope of her employment when she set the foot of her sewing machine down on her right index finger.
4. On or about October 3, 2002, Plaintiff developed an occupational disease (I.C. File Number 311312), specifically bilateral carpal tunnel syndrome, due to causes and conditions characteristic of and peculiar to her employment with Defendant-Employer. On or about October 3, 2002, Plaintiff contends she contracted Raynaud's disease due to causes and conditions characteristic of and peculiar to her employment with Defendant-Employer.
5. Plaintiff's May 20, 2002 injury by accident and her October 3, 2002 occupational disease of bilateral carpal tunnel syndrome were accepted as compensable by the PMA Insurance Group, but the PMA Insurance Group denied Plaintiff's claim for Raynaud's disease. The PMA Insurance Group was the carrier of the workers' compensation insurance for Defendant-Employer until July 1, 2003. *Page 4 
6. Plaintiff first saw Dr. Mark McGinnis, a board certified orthopedic hand surgeon, on October 16, 2002, at which time the principal problem seemed to be consistent with carpal tunnel syndrome. Plaintiff was having some degree of arterial spasms or blood vessel spasms, which is referred to as Raynaud's disease or phenomenon. There were some ulcerations at the tip of her right index, long, and ring fingers, and there was a purplish color to her digits, and her fingers were cool.
7. Plaintiff's nerve conduction studies on November 5, 2002, were consistent with a mild bilateral carpal tunnel syndrome.
8. Plaintiff underwent right carpal tunnel release with Dr. McGinnis on November 25, 2002, and left carpal tunnel release on December 19, 2002, with Dr. McGinnis.
9. On January 22, 2003 Plaintiff had a follow-up appointment with Dr. McGinnis, at which time Plaintiff had tenderness at the incision sites. Her grip strength was much weaker than would have been expected at eight weeks after surgery on the right and five weeks after surgery on the left. There were ulcerations on the tips of some of Plaintiff's fingers, which were consistent with Raynaud's disease.
10. Dr. McGinnis went to Defendant-Employer's plant to view Plaintiff's job on March 19, 2003. Dr. McGinnis did not believe that Plaintiff's job was very strenuous and opined that Plaintiff could go back to sewing activities with no specific restrictions.
11. On May 13, 2003, Plaintiff went to see Dr. Steven Merrill, a board-certified family practitioner. Plaintiff presented with numbness and pain in her fingers and the palms of both hands. The pain had been present for five months since having carpal tunnel surgical decompression of both wrists. She was very tender with pressing or compressing over the median nerve in the wrist. Plaintiff had atrophy of the muscles of the palm, particularly in the *Page 5 
area of the base of the thumb. She had a positive Tinel's sign, which is usually seen in carpal tunnel syndrome when there is damage to the median nerve. Dr. Merrill thought Plaintiff needed to see another orthopedist for a second opinion because the orthopedist who did the surgery did not feel that Plaintiff needed any further assessment or management, and Dr. Merrill disagreed. Dr. Merrill referred Plaintiff to North Carolina Baptist Hospital.
12. Plaintiff saw Dr. Anthony DeFranzo for the first time on June 5, 2003. Dr. DeFranzo is board certified in plastic and reconstructive surgery and in general and hand surgery. Plaintiff's complaints at the time were of pain and numbness and tingling in her fingers.
13. Plaintiff saw Dr. McGinnis for the last time on June 11, 2003. She told Dr. McGinnis that the Defendant-Employer did not show him her true job and indicated that the job video presented to Dr. McGinnis was not accurate. On the June 11, 2003 visit, Plaintiff had a tremor in her hand. She had relatively weak grip strength. Dr. McGinnis recommended mild limitations with regard to pushing, grasping, pulling, and repetitive movements, and no lifting over 10 pounds. Dr. McGinnis felt that Plaintiff could continue doing the sewing job that she was performing, and he thought Plaintiff had Raynaud's phenomenon (disease), secondary to carpal tunnel syndrome.
14. On June 19, 2003, Plaintiff had nerve conduction studies done. The studies looked normal and there was no evidence of any carpal tunnel syndrome, but Plaintiff was having carpal tunnel syndrome symptoms based on her physical exam, and dystrophic pain with features of Raynaud's syndrome.
15. On October 9, 2003, Plaintiff's objective tests were positive for carpal tunnel syndrome; she had a positive Tinel's test; she had weakness and she had a positive Phalen's test. *Page 6 
Plaintiff continued to have problems with pain, numbness, and tingling. She had a positive physical exam and complaints consistent with carpal tunnel syndrome.
16. Plaintiff underwent sympathectomy on her right hand on April 1, 2005, with Dr. DeFranzo and sympathectomy on her left hand on May 23, 2005, with Dr. DeFranzo. Dr. DeFranzo described sympathectomy as dividing the median nerve connections to the blood vessels that they control.
17. Dr. DeFranzo stated that if the median nerve problem was causing the Raynaud's phenomenon (disease), then the Plaintiff should get much better after the nerve connections were severed. Dr. DeFranzo stated that the Plaintiff improved remarkably after the sympathectomy. Dr. DeFranzo testified that her hands did not hurt anymore and her hands were warmer and had much less discoloration. Dr. DeFranzo testified that the problem with her median nerve, which had been caused by her carpal tunnel syndrome, was a significant factor in Plaintiff's Raynaud's phenomenon (disease). Dr. DeFranzo opined that Plaintiff's position as a skirt sewer was the cause of her hand problems.
18. Dr. Merrill opined that Plaintiff's continuing median nerve neuropathy and vascular instability in both wrists were work-related. He was familiar with the sewing job Plaintiff had and was of the opinion that the upholstery sewing position exposed Plaintiff to a higher risk of developing carpal tunnel syndrome over the general public and was a significant causative factor in Plaintiff's hand problems. He opined that returning to an upholstery sewing job would worsen Plaintiff's carpal tunnel syndrome or median nerve problem.
19. On April 1, 2005, the Industrial Commission approved a Final Compromise Settlement Agreement (Settlement Agreement) between Plaintiff, Defendant-Employer and The PMA Insurance Group (Carrier-Defendant for Plaintiff's May 20, 2002 injury by accident and *Page 7 
the October 3, 2002 occupational diseases of bilateral carpal tunnel syndrome and Raynaud's disease). In the Settlement Agreement, Plaintiff agreed that "notwithstanding the controversy between [Plaintiff] and [Defendant], and in specific recognition of the need for finality in the litigation, [Plaintiff], through counsel, has offered to compromise and settle all matters and things at issue between herself and [Defendant] for PMA Insurance Group's period of coverage up to July 1, 2003." The Settlement Agreement does not state that Wausau Insurance is responsible for Plaintiff's continuing hand problems beginning July 1, 2003. It merely states that, "it is now the contention of both parties that responsibility for [Plaintiff's] continuing hand problems after June 30, 2003 is the responsibility of Wausau Insurance, the carrier beginning July 1, 2003." There is no evidence that Wausau agreed to be responsible for Plaintiff's continuing hand problems after June 30, 2003.
20. Plaintiff is now alleging that as a result of returning to work for the same employer, in a highly repetitive job, her employment caused her carpal tunnel syndrome and Raynaud's syndrome to substantially worsen. There was no evidence presented, medical or otherwise, which establishes that Plaintiff, as of July 1, 2003, or at any time thereafter, suffered a new injury or aggravation of her existing occupational diseases of bilateral carpal tunnel syndrome and Raynaud's disease, the occupational disease claims released in the Settlement Agreement as to The PMA Insurance Group and Defendant-employer prior to July 1, 2003.
21. Based on the greater weight of the evidence, Plaintiff's bilateral carpal tunnel syndrome has never resolved and her complaints related thereto have been continuous. Dr. De Franzo testified that Plaintiff fell into the 15% percent category of patients that do not improve following carpal tunnel releases. He testified that Plaintiff still has physical carpal tunnel symptoms, as well as features of Raynaud's syndrome. Because Plaintiff's symptoms did not *Page 8 
significantly improve, he testified that he performed bilateral sympathectomies on her hands in April 2005 and May 2005. Plaintiff's symptoms greatly improved after the surgeries. Dr. De Franzo testified that carpal tunnel syndrome is a significant factor in causing the development of Raynaud's syndrome. In addition, Dr. Merrill testified that he felt that Plaintiff had Raynaud's syndrome and that on May 5, 2005, Plaintiff indicated that the numbness and pain in her fingers and the palmer aspect of both hands had been present for several years since her bilateral carpal tunnel syndrome surgery.
22. Plaintiff settled her claims for bilateral carpal tunnel syndrome and Raynaud's disease with Defendant-Employer and The PMA Group, the Carrier-Defendant who was on the risk up until June 30, 2003. Plaintiff's current symptoms of bilateral carpal tunnel syndrome and Raynaud's syndrome are a continuation of and causally related to her conditions that she settled by compromise settlement agreement. Although The PMA Group no longer provides workers' compensation insurance to Defendant-Employer after June 30, 2003, it was still liable for all the compensable consequences of Plaintiff's May 20, 2002 injury by accident and her October 3, 2002 bilateral carpal tunnel syndrome. The PMA Group did not admit liability for Plaintiff's Raynaud's disease. However, Plaintiff's Raynaud's syndrome was causally related to her carpal tunnel syndrome, which The PMA Group admitted as compensable. Plaintiff's settlement of all conditions for which The PMA Group was responsible included her Raynaud's syndrome. As Plaintiff has settled her prior claims, her current claim for the same occupational diseases with the same Defendant-Employer is barred, even though a new carrier provided workers' compensation insurance coverage for this Defendant-Employer beginning July 1, 2003.
23. As Plaintiff's claim is barred, the request for an accurate job video is irrelevant. *Page 9 
24. Based on calculations derived from the Form 22 stipulated into evidence, the Plaintiff's average weekly wage is $834.44, yielding a compensation rate of $556.32.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On or about October 3, 2002, Plaintiff developed an occupational disease, specifically bilateral carpal tunnel syndrome, due to causes and conditions characteristic of and peculiar to her employment with Defendant-Employer. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's bilateral carpal tunnel syndrome has never resolved and her complaints related thereto have been continuous. Plaintiff's carpal tunnel syndrome was a significant factor in her development of Raynaud's syndrome. "When a first cause produces a second cause that produces a result, the first cause is a cause of that result." Heatherly v.Montgomery Components, Inc., 71 N.C. App. 377, 380, 323 S.E.2d 29, 30
(1984) (quoting Petty v. Transport, Inc., 276 N.C. 417, 173 S.E.2d 321
(1970)).
3. At the time Plaintiff developed her bilateral carpal tunnel syndrome and Raynaud's syndrome, The PMA Group was the carrier at risk. The PMA Group is responsible for paying Plaintiff's medical and indemnity benefits on behalf of the Defendant-Employer. Plaintiff, Defendant-Employer and The PMA Insurance Group (Carrier-Defendant who was on the risk up until June 30, 2003), entered into a Settlement Agreement which was approved by the Industrial Commission on April 1, 2005, settling Plaintiff's claims for bilateral carpal tunnel syndrome and Raynaud's syndrome, thereby barring Plaintiff's current claim for further benefits for this condition. *Page 10 
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Under the law, Plaintiff's claim for benefits must be, and is hereby, DENIED.
2. Each side shall bear its own costs.
This the ___ day of April 2007.
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ ________________________ DIANNE C. SELLERS COMMISSIONER
 S/ ________________________ PAMELA T. YOUNG COMMISSIONER