602 So.2d 1023 (1992)
Sharlyn BROUSSARD, Plaintiff-Appellee,
v.
HOLLIER FLOOR COVERING, INC., et al., Defendant-Appellant.
No. 90-1330.
Court of Appeal of Louisiana, Third Circuit.
May 20, 1992.
*1024 Waltzer & Bagneris, Paul S. Weidenfeld, New Orleans, for plaintiff-appellee.
Preis, Kraft, Ward F. LaFleur, Lafayette, Kim R. Hayes, Crowley, for defendant-appellant.
Before DOUCET, LABORDE and CULPEPPER[*], JJ.
LABORDE, Judge.
This case involved a claim for worker's compensation asserted by plaintiff, Sharlyn Broussard against Hollier Floor Covering, Inc. Plaintiff seeks death benefits on her behalf and on behalf of her minor children under the Louisiana Worker's Compensation Act arising out of the suicide death of her husband, Claude Joseph Broussard. The trial court found the decedent was suffering from a mental disease at the time of his death and awarded death benefits to plaintiff. Defendant, Hollier Floor Covering, Inc., appeals alleging the trial court erred in awarding plaintiff death benefits under the Louisiana Worker's Compensation Act arising out of the suicide of decedent. We affirm the decision of the trial court and adopt its well written reasons for judgment as our own attached as Appendix A.
All costs of this appeal are assessed to defendant, Hollier Floor Covering, Inc.
AFFIRMED.

APPENDIX A

REASONS FOR JUDGMENT

(Filed July 13, 1990)
This case has been jointly submitted by the parties for disposition by the Court without a trial. The case was taken under advisement on July 5, 1990, when the Court received the last briefs submitted by counsel. The parties and counsel are as follows:
Plaintiff, Sharlyn Broussard, represented by Paul S. Weidenfeld; and Defendants, Hollier Floor Covering, Inc. and Louisiana Retailer's Association, represented by Ward F. LaFleur.
The parties stipulated to the following facts:
Sharlyn Ann Trahan Broussard and Claude Joseph Broussard were married on December 2, 1977. Two children were born of their marriage; Tiffany Therese Broussard (date of birth, 04/18/73) and Claude *1025 Joseph Broussard, Jr. (date of birth, 10/11/77). At all times relevant, Sharlyn Broussard and her two children resided with Claude Joseph Broussard; and, further, at all times relevant, Sharlyn Broussard and the two minor children were and are dependents within the meaning of La. R.S. 23:1021 et seq. Sharlyn Broussard has not remarried since the death of Claude Broussard.
Claude Joseph Broussard had been an employee of Hollier Floor Covering, Inc. for approximately fourteen (14) years when he sustained a work related injury to his back on October 14, 1986. He was picking up or moving a roll of carpet at the time of the injury. Following a period of conservative treatment, Mr. Broussard had surgery to his back on February 18, 1987. His medical history from the date of the accident until his death is documented through and by joint exhibits 1 through 5.
Weekly worker's compensation benefits of $190.49 based on an average weekly wage of $285.00 were paid from the date of injury until September 2, 1987 when Claude Joseph Broussard took his life by a selfinflicted gunshot wound. Medical benefits were also paid through that date. A petition was timely filed to the Office of Worker's Compensation seeking death benefits and the recommendation of the board was issued on October 13, 1988. The recommendation of the board was not accepted by all parties and a petition to recover worker's compensation benefits was timely filed by mail in the Fifteenth Judicial District Court on November 9, 1988.
Additional facts are that on February 18, 1987, Dr. Louis Meuleman, Mr. Broussard's treating physician, removed a herniated disc from Mr. Broussard's back, at the L5-S1 level. After several months of physical therapy, Mr. Broussard appeared to be steadily improving. However, on August 24, and 31, 1987, Mr. and Mrs. Broussard saw Dr. Meuleman, who, in a letter dictated to Mr. Broussard's insurance claims carrier, described the visit as follows:
Claude J. Broussard was seen on the 31 August 1987. Before this visit, the patient was seen on the 26th August, 1987 and came with a litany of complaints that defied description. Just about everything from breathing on down caused pain to both the back and leg and the leg pain seemed to provoke the back pain and the back pain seemed to provoke the leg pain. There was no doubt in the writer's mind that on that particular day, that was not the day Mr. and Mrs. Broussard should have been at the office to relate this myriad of complaints. When Mrs. Broussard raised the question as to just when her husband was going to get well, the writer told both of the people quite frankly that for anyone who has gone this far after a surgery and still complaining as bitterly, the probabilities of getting well were out of the question and probably he was going to remain ill for the rest of his life. Furthermore, this is the type of case that eventually gets wandering from doctor to doctor and everyone has a suggestion for another operation and this decidedly makes things worse than what they were to start with. As the reader might surmise that particular morning the writer was not particularly in tune with the complaining patient part of medicine.
The long and short of it was that Mr. and Mrs. Broussard were told that the writer would make a mad stab at seeing what might be wrong even though the xrays looked to be quite normal, at least from the stand point of the solidarity of the fusion, but a tomogram would be ordered and following that CT scanning would be done to ascertain specifically whether there was or was not any recurrent disc rupture.
The results of the tomography and CT scanning performed on the 27th August 1987 made at the Lafayette General Medical Center are given in their entirety as follows:
"Tomograms of the lumbosacral spine: Tomograms were obtained in both oblique projections. Spinal fusion bone mass is present bilaterally extending from the lower margin of L3 to S1. The bone masses are intact."
*1026 "CT scan of the spine: Multiple scans were obtained through L3-4, L4-5 and L5-S1. Bone fusion has been accomplished from the lower margin of L3 through S1. Laminectomy changes are present at L4-5, left. There is no evidence of recurrent herniated nucleus pulposus. The bone mass appears to be intact. The neuralforamina are widely patent."
The patient and his wife returned to the office on the 31st August 1987, the writer was confronted with two rather fighting individuals who professed not have understood anything that had been said on the last visit and to the question as to why there are so many continued complaints, could only be answered that when one does have a disc rupture, that in itself implies that there is some nerve damage. If it were other than that how would one appreciate any pain following along the course of any specific nerve. Some people are left with some residual in the form of slight weakness, to slight numbness; others come out scott free. Which ever way it is, that individual has to accept what he has and stop moaning and groaning about it. It will be recalled in the past that the writer recognized that part of this man's problem was extreme tightness of the hamstrings and he was referred to the Physical Therapy Clinic to get that corrected. At the last visit the patient stated specifically that that part of the treatment did help him immeasurably, however, once the stretching had been accomplished, then he had not done anything more about it and it is now coming right back to what it was before. The point was emphasized that medicine is a two-way street. Either the individual wants to get better and help himself and if, you do not, then that is the way you stay and the best advise that the writer can give anyone is to keep your moaning and groaning to yourself.
After all of this was said and done, the attitudes seemed to change a wee bit and it was admitted that his physical therapy program had helped him, and the pain factor that he was having in the leg was certainly nothing as pronounced as to what it was before the surgery, so at least, for a short period of time there was a little change in the thinking. The patient made the specific remark that he had been using a TENS Unit from time to time and this aided him materially. This was the first time that this office had ever heard anything that was halfway good coming out of this case. This patient is like so many individuals who have a tremendously long list of "can't dos" and they always conveniently forget what they can do.
Three (3) days after Mr. Broussard's last visit to Dr. Meuleman, he committed suicide by a self-inflicted gunshot wound to the head.
By deposition, the plaintiff, Mrs. Broussard, testified that before his back injury, Mr. Broussard was relatively happy, not depressed, discouraged or despondent and was pretty confident about his back surgery as he progressed with his therapy. Unfortunately, he experienced only temporary relief and then continued to have persistent pain. Mrs. Broussard first noticed a change in Mr. Broussard's personality in August, 1987 after they saw Dr. Meuleman. According to Mrs. Broussard who was present on August 24, 1987, her husband expressed his concern to Dr. Meuleman that he was still experiencing pain. Dr. Meuleman allegedly responded "There is no reason why you shouldn't be going back to work now. I just had a guy in my office and this guy is going back to work." After Mr. Broussard told Dr. Meuleman that he did not feel well enough to go to work, Dr. Meuleman allegedly stated "I knew from day one of your surgery that you weren't going to get better. I don't know what else I can do for you. What I'm going to do is go ahead and run you to the hospital and let them run a test on you to look at the disc and how it is healing and everything and hopefully you won't have to go back to surgery." (Sharlyn Broussard deposition pg. 17)
In the following four (4) days, Mr. Broussard went into a depression, expressing to *1027 his wife his fear about what the doctor had told him and afraid his compensation would end before he was physically able to go back to work. He was very concerned that the subsequent tests were unable to account for his continued pain.
On the August 31, 1987 visit to Dr. Meuleman, Mrs. Broussard told Dr. Meuleman that she was upset about the things he told them on their previous visit. She also stated that her husband had been depressed and unable to sleep and was still in constant pain. Dr. Meuleman told both of them that physical therapy provided only temporary relief and then prescribed six (6) to eight (8) weeks of therapy and a TENS Unit to temporarily relieve the pain.
Three (3) days later, Mr. Broussard look [took] his own life. During that three (3) day period, Mr. Broussard remained depressed about his condition but never expressed any suicidal thoughts nor left a suicide note. In fact, the Broussards had an appointment to see another physician for a second opinion on the day after he committed suicide.
Both sides retained experts in the field of psychiatry, Dr. Dennis E. Franklin and Dr. Paul D. Ware. However, both experts essentially agreed on their opinions as to the state of Mr. Broussard's mental health at the time of his suicide. Both physicians concluded essentially that Mr. Broussard was in a "severe depression" which both defined as a mental disease or mental illness which can be successfully treated medically. Also both physicians opined that Mr. Broussard's depression was directly related to his back injury and his failure to respond to treatment and ultimately caused his suicide.
The plaintiff filed suit for worker's compensation death benefits, alleging that her husband's suicide was proximately caused by his work related injury, the surgery, the unsuccessful recovery and the resulting depression. The defendants contend that the plaintiff is not entitled to recover because under La.R.S. 23:1801 [23:1081], compensation is not allowed when the injury is caused by the injured employee's willful intention to injure himself. Jurisprudence interpreting this defense has limited recovery to only those suicides which are the result of insanity, psychosis, mental derangement, or mental disease caused by the work related injury. The defendants contend that Mr. Broussard's mere "severe depression" was insufficient to rise to this standard and as such, the plaintiff must be denied recovery.
The leading case on this point is Soileau v. Traveler's Ins. Co., 198 So.2d 543 (La.App. 3rd); writ denied 250 La. 978 [200 So.2d 665] (La.1967) where the Court held:
[W]here death is caused by suicide, death benefits may not be recovered under the Louisiana Workmen's Compensation Act unless it is established that the suicidal act was the product of some form of insanity, mental disease, mental derangement or psychosis, which resulted from the injury. Otherwise, a suicide is attributable to the decedent's own volitional act which constitutes an "independent intervening cause." It is not sufficient for recovery to show that the suicide resulted merely from the fact that the decedent had become discouraged, depressed, despondent or melancholy as the result of the accident or injury.
The Court finds that applying this standard to the facts of this case would result in an inconsistent ruling. The decision allows recovery for a suicidal act that was the product of some form of insanity, mental disease, mental derangement or psychosis which resulted from the injury. Both medical experts agreed that the plaintiff's severe depression was a "mental disease" which was a direct result of Broussard's inability to fully recover from his work related injury. Obviously, the state of medicine today classifies a severe depression that leads to a suicide as a "mental disease." However, the Court in Soileau stated that it was "not sufficient for recovery to show that the suicide resulted merely from the fact that the decedent had been discouraged, depressed, despondent or melancholy as a result of the injury." Despite the experts classification of the decedent's mental state as a "mental disease," the *1028 facts show that he was simply depressed as a result of his injury and inability to recover. When Soileau was decided, apparently the Court did not consider "severe depression" as a result of any injury to be a "mental disease." However, today, medicine does consider it as such.
The analysis of whether or not a "severe depression" rises legally to the definition of "mental disease" does not, in the Court's opinion, completely address the issue of whether or not benefits are recoverable. In distinguishing between "mere depression" and "mental diseases", the Court in Soileau tried to establish a category of recovery where the decedent's lack of free will was most apparent, since R.S. 23:1801 [23:1081] specifically excludes coverage for an employee's willful intention to injure himself. Hence, the Court limited recovery only to those classified as insane, psychotic or deranged, terms that negate any free will or ability to control on the part of the suicide victim.
The Court finds that a more appropriate analysis of whether or not compensation benefits are recoverable would be to consider the evidence on the decedent's free will or ability to control his actions. The Court believes that this analysis is consistent with the goal sought in Soileau and is also more appropriate when analyzing the facts under modern medical definitions of "illness" or "disease."
In this instance Dr. Franklin testified regarding Mr. Broussard's mental state at the time of his suicide as follows:
In a patient with major depression, the usual set of events that leads to a suicidal attempt is a progression of the depression to the point where the person has their view of their future and present status clouded to the point where they feel that their situation is absolutely hopeless. There is no escape from whatever it is that is troubling them, and they see suicide as a viable option.
In the case of a patient with major depression, the suicide attempt is usually a bonafide suicide attempt. In other words, some suicide attempts are gestures strictly to manipulate others to get attention. In the case of major depression, in the case especially of suicide with a firearm, there is clear intent to complete the suicide. That would indicate a degree of despair, that the person has basically given up, there isn't any alternative, and that suicide is the only viable option.
By Mr. Weidenfeld:
Q Would you consider it to be true that Mr. Broussard had no viable options?
A No, but Mr. Broussard, in his state of depression probably felt that way.
Q That to me seems a fairly severe misperception. Is that a fair statement?
A That's correct, and that is one reason why we are so aggressive in treating major depression, because there is a very real possibility of suicide in an untreated major depression because of the misperception that the depressed patient has over their future, their present, and their dwelling on whatever they perceive their problems to be at the time.
Q And, is this misperception a direct result of the fact that the patient has the mental disease of major depression?
A It is  yes, it is a common condition in depression. Now, not everybody with major depression develops suicidal ideation, but those that do progress to the point where they feel that their situation is hopeless, and they are helpless to do anything about it (Deposition of Dr. Dennis Franklin, pages 33-34.)
However, later on cross-examination, Dr. Franklin stated:
Q And, you already described for us the mental process that you thought Mr. Broussard went through before he committed suicide, is that right?
A That's right.
Q As I interpret what you told us, the thought process is a pretty thought out type of thing that the patient makes a conscious decision that he is going to take his life rather than attempt to face the future?
A In the case of a major depression, what usually happens is the patient becomes more and more despairing and gradually looses all hope that there is *1029 any way out, and at some point makes that conscious decision.
Q What I am getting at, though, Doctor, there is no evidence at all that this particular gentlemen did not know what he was doing at the time he took his life?
A No, as a matter of fact, we presume that this was a deliberate suicide attempt.
Q Was a willful act on his part to inflict injury or death upon himself?
A Yes, which is not uncommon in a suicidally depressed patient. (Dr. Franklin's deposition, pages 52-53)
Later he stated:
Q So sometimes you have a clear stressor, which causes you mental depression, which, in turn, may cause some biochemical changes?
A Yes. The term "major depression" is really an exaggeration of symptoms of depression, which anybody can get, but the depression becomes so pervasive that you are unable to function within a normal sphere of activity. So it is not like a psychotic condition where it's clearly outside the realm of normal human experience. Hallucinations and delusions are not normally experienced.
Q That's right.
A Depression is to a degree. Major depression is an exaggeration of that, but it is something that the patient can't control, and it is something that picks up steam on its own and can develop into one of the most disabling of all psychiatric illnesses. (Dr. Franklin's deposition, pages 56-57.)
Dr. Paul Ware, the defendants' expert, concluded the following:
Q Doctor, having said that, did you see any evidence which would suggest to you, as a psychiatrist, that at the time that Mr. Broussard actually committed suicide, that he was not mentally capable of knowing what he was doing?
A I see nothing to indicate that he was not mentally capable of knowing what he was doing. I think he was certainly influenced enough by his depression that in that way his thinking reasoning was influenced, and I think he truly felt like he saw no way out of the difficulty he was having. (Dr. Ware's deposition, page 14.)
The worker's compensation law is to be liberally construed in favor of the claimant. Green v. Heard Motor Co. [224 La. 1077], 71 So.2d 849, 224 La. 1078 (1954). Both experts essentially agreed that while the decedent made a conscious decision to take his own life, he was without the ability to perceive that he had any other choice but to commit suicide. The Court finds that because he believed that he had no other choice, it negated his free will to control his actions. Hence, in liberally construing the law in favor of the claimant, the Court finds that the decedent lacked free will to prevent his suicide which was the direct result of his depression over his inability to fully recover from his work related back injury. Hence, the Court finds that his death is compensable under the worker's compensation statute.
Judgment will be signed upon presentation.
Thus Rendered and Signed in Chambers, at Crowley, Louisiana this 12th day of July, 1990.
 /s/ Don Aaron, Jr.
 DISTRICT JUDGE
NOTES
[*] Judge Culpepper, retired, participated in this decision as Judge Pro Tempore.