WICKER, Judge.
This appeal arises from a claim for worker’s compensation filed by the wife and child of the decedent, Craig Burlin (Craig), against Craig’s employer, C.D. Montz & Company, Inc. (Montz) and its insurer, State Farm Fire & Casualty Company (State Farm). Christine Burlin (Christine), the widow, and Nicole Burlin, the minor child,[1] seek death benefits for Craig’s death which occurred on August 4, 1996. They allege Craig committed suicide as a result of physical trauma suffered from a job injury occurring on January 4, 1994. Petitioners/appellees claim entitlement to penalties and attorney’s fees as a result of the withholding of authorization for medical treatment and the withholding of payment of worker’s compensation to a surviving spouse and a dependent child. The death certificate lists the cause of death as suicide resulting from a shotgun wound to the head.
The parties stipulated that worker’s compensation benefits and expenses were paid through August 7, 1996. The notice that compensation benefits were stopped on August 7, 1996 lists the reason for terminating benefits to be the death which occurred on August 4, 1996. The worker’s compensation judge found that Craig was injured during *1056 the course and scope of his employment at Montz on January 4,1994. She found he was entitled to receive weekly temporary total disability benefits from January 4, 1994 through August 4, 1996, with |2credit to Montz for compensation benefits which had been previously paid. She also awarded payment of all outstanding medical bills, medication, expenses, and transportation expenses arising from the accident although she did not set a specific monetary amount. The worker’s compensation judge found a direct causal connection between Craig’s mental condition, his death, and the accident. She granted Christine and Nicole worker’s compensation benefits. She further assessed a penalty of $2,000 and attorney’s fees of $2,000. Montz and State Farm now appeal and argue the trial judge was manifestly erroneous in these findings. We affirm and remand.
The evidence at trial revealed that Craig worked as a painter/foreman for Montz when he fell at work on January 4, 1994 injuring his left knee, neck, and lower back. Approximately seven-to-eight years before this accident, he had a lumbar fusion from a previous injury. Craig sustained two prior injuries to his lower back, but had been discharged to return to work from both accidents. In 1998 Dr. Robert Múñeles, an orthopedic surgeon, discharged Craig to return to work following the seeond accident in 1992.
After the current aeeident, Craig primarily received treatment from Dr. Mímeles, Dr. Charles Billings, Oschner Foundation Hospital, Dr. Pedro J. Crespo, and Dr. Alvin M. Rouchell. Drs. Mímeles and Billings were Craig’s orthopedic surgeons. Drs. Crespo and Rouchell were his psychiatrists. Dr. Richard Roniger, a psychiatrist, was the defense’s independent medical examiner.
Dr. Mímeles treated Craig from April 1994 to December 1994. He felt Craig sustained a soft tissue injury to the neck which should have resolved by June 1994. By December 1994 Craig had undergone three months of physical therapy and was taldng a prescribed narcotic for pain. Dr. Mímeles recommended an MRI of the neck in April 1994. The MRI was not performed until June 1994. He interpreted the MRI as being negative, with no indication of ruptured discs or pinched nerves.
However, when Dr. Múñeles was deposed on May 28, 1996 he referred to an EMG nerve test of the arms and neck taken by Dr. Olson in May 1994. Dr. Olson reported that Craig showed evidence of “right C6 radiculo-pathy.” Dr. Mímeles disagreed with this finding but stated he would like to have another EMG from a different neurologist since the EMG is ^subject to interpretation. There is no indication a second EMG was performed as requested by Dr. Mímeles. Therefore, as of May 28, 1996 there were inconsistent results from a cervical MRI and an EMG nerve test.
Craig was next treated for his orthopedic problems by Dr. Billings. Dr. Billings testified he treated Craig from May 1995 to June 1996. Craig related to him that after the accident he was seen at East Jefferson Hospital’s Emergency room by Dr. Altman. Craig told Dr. Billings he next saw Dr. Olson. Dr. Billings explained that Craig was being treated for his left knee injury by Dr. Manale.
Dr. Billings testified the accident aggravated Craig’s preexisting lumbar spine condition. He diagnosed Craig as having:
Lumbar disc and joint disease with post traumatic exacerbation, that is increase in symptoms related to the accident he described on January 1994.
Dr. Billings testified that although his findings on examination of Craig’s neck, back, and left knee were subjective, the findings were consistent with Craig’s complaints of pain. When he first saw Craig on May 8, 1995 he recommended restriction in activities, medication, physical therapy, and diagnostic studies of the lumbar spine and knee. Although Dr. Billings requested MRI testing in May 1995 the testing was not done until November 24,1995.
The MRI of the lumbar spine showed significant degenerative disease at L4-5 and L5-S1. Dr. Billings stated these findings were consistent with Craig’s complaints. The MRI of the left knee and cervical spine were negative.
*1057 Craig continued to complain of chronic pain to Dr. Billings. By September 1995 Craig’s primary complaint was daily low back pain, with radiation to his leg and hip. He also continued to complain of persistent neck and shoulder pain. In September 1995 Dr. Billings found no significant change in Craig’s examination. On that date he recommended further diagnostic studies in the form of an MRI. However, the MRI was not done. Dr. Billings continued to prescribe pain medication and a muscle relaxant.
Dr. Billings saw Craig on January 29, 1996. Craig complained of persistent low back pain and left lower extremity pain. On that date Dr. Billings recommended a myelo-gram and a CT scan because of physical findings and continued complaints. These tests were not ^performed until March 19, 1996. Dr. Billings testified these test results were consistent with Craig’s complaints and showed significant disc disease at L4-5 and L5-S1. Dr. Billings’ prior diagnosis remained the same after seeing these tests.
On April 11, 1996 Craig saw Dr. Billings complaining of persistent neck and back pain. On this date, Dr. Billings discussed with Craig and his wife the need to reduce pain medication and Craig was referred to Touro pain clinic. Dr. Billings did not know if Craig was ever admitted to the pain clinic. He noted that Craig had made numerous requests for pain medication and that Craig was counseled about excessive use.
On April 11, 1996 Dr. Billings recommended continued restriction in activities, as needed. He further stated:
No heavy lifting, no prolonged sitting or standing, no repetitive bending or stooping ... no medical contraindication for his attempting lighter sedentary work activities. But I felt it highly unlikely that he was capable of returning to any form of gainful employment until further treatment, particularly regarding the medication usage [emphasis added].
Dr. Billings testified he did not think Craig was capable of doing light duty or sedentary work with Vicodin and Vistaril, his' medications.
On June 14, 1996 Dr: Billings saw Craig. He continued to complain of low back pain, left leg pain, numbness and tingling. He had complaints of numbness and tingling off and on. - Dr. Billings noted no neurological impairment and that Craig’s complaints were still subjective. Dr. Billings expressed concern about the use of medication. He felt the psychiatrist should address the issue of pain medication. He stated:
his chronic pain picture was such that a team approach would be more likely to have some degree of success in controlling the medication usage, as well as, permitting rehabilitation at some point.
He placed Craig on the same restrictions in June as he had done in April. He did not think Craig could do light duty or sedentary work. He felt he needed a combined approach with a psychiatrist or a form of integrated chronic pain management. Craig was having chronic pain and was requiring large amounts of medication. Dr. Billings did not see Craig after June 14,1996.
Dr. Billings explained there was objective evidence of pain in the lumbar spine because Isthere was anatomical evidence of an ongoing process requiring treatment. In June 1996 he did not feel there was a need for further diagnostic studies. There was also nothing warranting surgical intervention. He did not recommend any other invasive diagnostic procedure. He felt Craig needed further nonsurgical treatment before any other invasive studies were done.
On cross examination he explained that Craig was using larger and larger amounts of pain medication without improvement. He was referred to an MRI of the cervical spine which was taken March 1996 and stated that this was probably normal.
He explained that to some degree the disc and joint disease predated the accident. . He stated:
I think it [the accident] probably exacerbated or increased some of the degenera-five changes in the spine, based upon his history.
The records fi*om Oschner Foundation Hospital were introduced. These included the notes taken by Dr. Pedro J. Crespo, the *1058 psychiatrist who first treated Craig. Dr. Crespo reported first seeing Craig on May 26,1995. On that date Craig, told Dr. Crespo the pain was so bad he contemplated suicide. Dr. Crespo noted that Craig appeared to be in pain and showed discomfort during the interview. He diagnosed him as having: “Major Depression, single episode, moderate to severe with significant anxiety.” Hospitalization was offered but refused by Craig. Dr. Crespo did not think Craig was eommittable at the time. Dr. Crespo warned Craig against driving and operating machinery with the medication.
Dr. Crespo saw Craig on the following dates: June 8,1995; June 22,1995; June 29, 1995; July 10, 1995; July 17, 1995; July 24, 1995; July 31,1995; August 7,1995; August 21, 1995. Dr. Rouchell took over treatment on October 19,1995.
On several occasions when Craig was seen by Dr. Crespo he voiced suicidal ideation because of the pain. On June 8, 1995 Dr. Crespo referred Craig for pain management but noted that Craig, a resident of Mississippi, was unable to secure a place to stay for the duration of his treatment. Dr. Crespo also found that along with the Major Depression, Craig suffered from character pathology and chronic pain.
On June 22, 1995 Dr. Crespo referred Craig to a “BMU” unit in order for him to have treatment of chronic pain and his char-acterological issues. However, Dr. Crespo noted that the program was from 8:00 a.m. to 4:00 p.m. Monday through Friday and that Craig lived in ^Mississippi. He noted Craig was unable to secure a place to stay for the duration of the program.
Dr. Rouchell also diagnosed Craig as suffering from Major Depression. He testified he treated Craig from October 19, 1995 until April 1996. In April 1996 Dr. Rouchell discontinued treating Craig because Craig would not abide by his treatment plan. Although he advised Craig to seek treatment with another psychiatrist, Craig received no further psychiatric treatment. Dr. Rouchell did not specifically refer Craig to another psychiatrist.
Dr. Rouchell testified that Craig had been hospitalized in May 1995 at Oschner Foundation Hospital for depression. He explained the basis for his diagnosis that Craig was suffering from a major depression related to the accident as follows:
He had just about all the symptoms of Major Depression: sadness, crying spells, trouble with his sleep, changes in his appetite, feelings of worthlessness, helplessness, hopelessness. He had suicidal thoughts. So by his history, it seemed that the accident was the precipitating event and that he had developed a Major Depression.
He further testified that any severely depressed person is at risk for suicide. He stated:
When patients get very depressed, they begin to feel very hopeless. They can’t see a way out. And even depressed patients who don’t have chronic pain will see suicide as a means of ending their emotional pain. And I think Mr. Burlin had not only emotional pain with his depression but chronic pain-because of his back and knee difficulties. ■
Dr. Rouchell sought an unbiased evaluation from Dr. Swift, Chairman of the Occupational Medicine Department at Oschner. However, the insurer did not follow through on Dr. Rouchell’s recommendation.
Dr. Rouchell met with Mrs. Beverly Hegre, a rehabilitation counselor, on December 1,1995. He told her Craig had a personality disorder and a Major Depression. He informed her the Major Depression was the result of the accident and “in his mind the inability to get help with his pain.” He explained to her it was difficult to evaluate his pain complaints without a complete medical orthopedic evaluation.,
Craig’s threats of suicide were always in the context of his being in pain and being unable to tolerate the pain. Although Dr. Rouchell recognized that Craig may have voiced suicidal' ideation in order to obtain pain medication, he stated it was a “difficult call” to ^evaluate whether Craig really meant to kill himself.
*1059 Despite Craig’s voicing suicidal ideation’ at times during his treatment phase, Dr. Roue-hell did not feel Craig was suicidal when he terminated care in April 1996. On April 17, 1997, the date of Dr. Rouchell’s deposition, he stated he now believes Craig’s depression, coupled with his inability to cope with the pain led to his suicide.
Dr. Rouchell also testified he did not think Craig was malingering or lying. He explained that Craig is the type of individual, who with a little pain, magnifies it. When frustrated and upset, the pain is further amplified. He described Craig as inadequate and inept. He did not think Craig was a calculating and devious person.
Dr. Rouchell testified that from a psychiatric standpoint Craig could work. However, he further testified at his deposition taken May 31,1996:
... I think if he can get medical care and, you know, whatever can be done to alleviate his pain, if that can happen, you know, if he can be rehabilitated and get back to work, I think that would be, you know, a big step in his feeling better. I think probably for the next six months at least, you know, he will continue to need to be on tranquilizers and anti-depressants, but hopefully, you know, he can overcome whatever is wrong with his back and knee. I don’t know, but if he could get back to work, I think he would be okay.
I mean, his personality is going to be there, but I think the anxiety and depression is treatable. I think taking care of the physical part is a big part of resolving his anxiety and depression.
Dr. Rouchell testified that if there were no objective signs for pain then he would encourage Craig to return to work.
Dr. Richard Roniger, a psychiatrist, conducted an independent medical examination on September 13, 1995. He testified by depositions taken April 18,1995 and September 13, 1995. Dr. Roniger diagnosed Craig as having a personality disorder with passive dependent and immature features. Dr. Ro-niger was concerned about Craig’s dependency on medication.
He stated that from a psychiatric point of view, that as of September 13, 1995, there was no contraindication for Craig to return to work. Craig related to him a voice in his head told him to kill himself to end his misery, but that because of his Catholic upbringing, Craig did not act on that idea. Dr. Roniger stated that those threats should be taken seriously.
Dr. Roniger testified the personality disorder was not caused by the accident, but was a lifelong pattern. He stated Craig was depressed and that the Vicodin would have worsened the ^depression. He had no idea as to whether the work injury played a role in Craig’s decision to commit suicide. Craig told Dr. Roniger he wanted to find out what was causing his pain and to make a plan for treatment.
Dr. Roniger stated that Craig told him he was seeking psychiatric care because of the pain resulting from the accident. However, Dr. Roniger could not independently make that statement. Dr. Roniger noted that Craig made a series of calls to Dr. Crespo seeking medication. He stated that if a patient calls the office and does not take the physician’s advice, then his suicidal statements are attention getting.
In his deposition taken September 13,1995 Dr. Roniger stated that when he saw Craig he walked with a back brace, a left leg brace and walked with a limp. At the deposition the following colloquy occurred:
Q.... do you think he would be calling a psychiatrist and receiving treatment right now at this time if he didn’t have his physical problems?
A. No. I think those are connected ...
Christine testified as to last time she saw her husband alive. She stated that he demanded she obtain medication for him through her orthopedic physician. She refused and he lost control. In their 14 — year marriage he had never struck her, but he did on this occasion. He also threatened to kill her and himself if he did not have pain medication. She testified that he would have excruciating pain when he had no pain medication. She left the home with their daughter. In order to do so, she distracted him by *1060 calling Craig’s mother long distance. While he was on the telephone with his mother, Christine left the home.
Christine called him after she arrived at her sister’s home, but Craig continued to threaten to kill her and himself if he did not have pain medication. Her husband had never before threatened her. She did not believe he was sincere. When Craig did not respond to the sister’s arrival at the family home the next day, Christine went to the home the following day, accompanied by a friend. She discovered her husband was dead from a shotgun wound to the head. SUICIDE
Appellants argue that petitioners are not entitled to death benefits as a result of Craig’s |9suicide. They rely on the defense provided for in La.R.S. 23:1081(l)(a):
(1) No compensation shall be allowed for an injury caused:
(a) by the injured employee’s willful intention to injure himself or to injure another
[[Image here]]
That statute further provides that the employer bears the burden of proving the defense. La.R.S. 23:1081(2). The trial judge reasoned:
The evidence was clear and convincing that the decedent lived in pain for a period exceeding two years. The decedent had physical injuries, a personality disorder and major depression. The decedent was depressed because of his inability to work and to support his family in the same manner as he had before the accident. He was also depressed, because he was unable to obtain reasonable necessary medical treatment in a timely manner. The decedent was frustrated and forced to rely on pain medication. Living on pain medication, prevented him from being able to function at work. When the medication was discontinued he “lost control.” He had been threatening suicide for years to no avail and on August 4, 1996, he finally followed through on his threat.
It is clear, to this Court that there is a direct causal connexity between the work-related accident of January 4,1994 and his suicide on August 4, 1996. It is also clear that decedent’s injury of January 4, 1994 produced a derangement of his mind to the extent that he was incapable of formulating the specific wilful intent to injure himself.
Appellants rely on the case of Soileau v. Travelers Ins. Co., 198 So.2d 543 (La.App. 3rd Cir.), writ denied, 250 La. 978, 200 So.2d 665 (1967). In Soileau the court held that despondency, although causally related to the accident, was insufficient. Appellants argue that in order for claimants to recover death benefits, Craig must have suffered a work-related accident which caused him to be so mentally impaired he did not have the conscious volition to end his life. However, the trial judge examined the evidence in its entirety and did reach this conclusion. The appellants contend there was no evidence to support this finding. They argue that Craig’s treating psychiatrists did not believe he was suicidal. In particular, they contend that Dr. Rouehell could only conjecture as to the relationship between the suicide and the work injury.
The position taken by the earlier 1967 Soileau third circuit opinion was explained in a later opinion in 1992 by that circuit. Broussard v. Hollier Floor Covering, Inc., 602 So.2d 1023 (La.App. 3rd Cir.1992). In Broussard the third circuit held that in Soi-leau the court did not consider severe depression a mental disease, but that at the time Broussard was decided this | ipcondition was considered to be a mental disease. In Broussard, the decedent did not feel he had any other choice other than suicide, thus negating his free will to control his act. He lacked the free will to prevent the suicide. Further, the Broussard court recognized that worker’s compensation law is to be liberally construed in favor of the claimant. Id. at 1029. See also, Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689, 691.
•In Soileau the court examined the law in this area in other jurisdictions in order to fashion a rule for that circuit. However, since the 1960’s the law in this area has undergone change. See generally, 1A Arthur Larson, Worker’s Compensation § 36.00-36.63 (1995). This circuit now considers the current status of the law in fash *1061 ioning a rule. This court hereby adopts the chain-of-eausation approach adopted by the majority of jurisdictions. Id.
In Petty v. Associated Transport, Inc., 276 N.C. 417, 173 S.E.2d 321 (1970) the Supreme Court of North Carolina discussed the liberal interpretation given to the worker’s compensation act. It considered a North Carolina statute which excludes compensation for injury or death occasioned by the “willful intention of the employee to injure or kill himself or another.” This provision is identical to La.R.S. 23:1081. The North Carolina court, like the Louisiana courts recognize that worker’s compensation statutes are to be liberally construed in favor of the employee. Broussard, supra; Peveto, supra. It discussed the approach taken by the Supreme Court of Florida in Florida’s consideration of identical wording in its statute, as follows at 426-427:
In 1949 the Supreme Court of Florida adopted the ehain-of-causation test. Whitehead v. Keene Roofing Co., 43 So.2d 464 (Fla.1949). See Comment in 16 Vanderbilt L.Rev. 275 (1969). Whitehead involved facts and a statute practically identical with those we now consider. Whitehead, an employee, sustained serious injuries in a compensable accident. Three months thereafter he committed suicide by swallowing poison. He knew the consequences of his act, but at the time he was suffering from a mental disturbance directly attributable to the injuries he received in the accident. The Florida Act provided: ‘No compensation shall be payable if the injury was occasioned primarily * * * by the willful intention of the employee to injure or kill himself.’ In reversing the Circuit Court’s judgment denying death benefits to Whitehead’s dependents, the Florida Supreme Court said:
‘From the evidence, there can be no doubt that the death of the deceased was directly attributable to the injuries he sustained in the fall from the roof.
[[Image here]]
\n‘(W)e are not persuaded that the fact that a workman knew that he was inflicting upon himself a mortal wound will, in all cases, amount to a ‘willful intention’ to kill himself, within. the meaning of the statute. We believe that in those cases where the injuries suffered by the deceased result is his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered ‘wilful’ within the meaning and intent of the Act. * * *
While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; * * * ’ Id. at 465.
Other jurisdictions having statutes which prohibit compensation for willfully inflicted injuries and death have followed the ‘realistic and reasonable view of the Florida Court in Whitehead, Supra.
In Burnight v. Industrial Acc. Com., 181 Cal.App.2d 816, 821, 5 Cal.Rptr. 786, 790 (1960), Bray, P.J., said: ‘(S)uieide cannot be intentionally self-inflicted if, in spite of his act being one of conscious volition, the suicide, because of mental condition resulting from the injury, is unable to control the impulse to kill himself. * * * ’
******
We. conclude that the chain-of-causation test effectuates the purpose and intent of the Workmen’s Compensation Act. We hold, therefore, that an employee who becomes mentally deranged and deprived of normal judgment as the result of a com-pensable accident and commits suicide in consequence does not act wilfully within the meaning of G.S. s 97 — 12 [emphasis added.]
We adopt the reasoning in Petty, supra. and in Broussard, supra.
We have carefully reviewed the entire record and find no manifest error in the trial judge’s conclusion that Craig suffered Major Depression as a result of the accident. The trial judge correctly concluded Craig suffered severe pain for over a two-year period following the accident and became dependent on the pain medication prescribed to him. *1062 The record reveals the only relief he had from the pain was the pain medication. His treating psychiatrists’ records contain several statements made by him in which he threatened to kill himself if nothing were done to alleviate his pain. Furthermore, the medical records indicate he expressed frustration in dealing with the insurer. He voiced frustration at repeated delays in | ^medical testing recommended by his treating physicians.
We note that one recommendation by his treating physician was never complied with by the insurer. Dr. Rouchell, his treating psychiatrist, recommended that Craig undergo pain management. However, Christine testified the insurer would not approve payment for overnight housing provided at the Oschner Clinic. She explained that she and her husband lived in Poplarville, Mississippi at the time and that Craig was unable to drive back and forth each day. Additionally, Dr. Crespo noted in his records that he advised Craig not to drive or operate machinery while on Vicodin, his prescribed pain medication. Because Craig was unable to utilize another form of pain management, he became increasingly dependent on his pain medication. This dependence resulted in manipulative behavior aimed at obtaining an increased dosage of medicine from his treating physicians. Dr. Rouchell finally refused to treat Craig because of his manipulative behavior and his inability to follow Dr. Roue-hell’s treatment guidelines as far as medication was concerned. Craig was left with no psychiatric care after that date. A few months later he killed himself. There is no evidence of any attempt by the employer or the insurer to manage Craig’s pain through the alternative recommended by Dr. Rouc-hell.
A ehain-of-causation was overwhelmingly established and we find no manifest error in the trial judge’s conclusion the work injury caused the major depression and resulted in a dependence on pain medication. The record also reveals Craig had a preexisting personality disorder which was not caused by the accident. However, this disorder made him vulnerable to crises. His treating psy-ehiatrist testified he would be more likely to have difficulty coping with pain. Thus, the work injury aggravated a preexisting mental condition, making him vulnerable to depression and the ultimate suicide.
PENALTIES AND ATTORNEY’S FEES
Petitioners argued below they were entitled to attorney’s fees and penalties for two reasons; namely, the failure to timely authorize medical treatment and the failure to pay death benefits. The trial judge concluded that the defendants’ refusal to pay for medical treatment, diagnostic tests, and pain management justified the imposition of fees and penalties. Appellants argue the trial judge erred in assessing penalties and fees for failure on théir part tojisaward death benefits, since there was nothing to indicate a causal connection between the suicide and the accident.[2] The trial judge did not assess fees and penalties on that basis. She assessed them as noted above.
Christine testified the defendants repeatedly delayed in ordering tests and treatment recommended by Craig’s physicians. Dr. Billings testified that tests he ordered were not timely done. The defendants did not controvert the claim that they delayed in treatment. Importantly, Dr. Billings testified he recommended pain management for Craig. That recommendation were never implemented. Christine testified that in order for Craig to take advantage of the pain management program at Oschner, he would have to stay in town at a hotel connected to the hospital. Both she and her husband lived in Poplarville, Mississippi at the time. Dr. Billings did not want Craig to drive while on his pain medication. Christine testified the insurer refused to pay for Craig’s stay at the hotel in order to take advantage of the pain management recommended.
The defendants only considered Dr. Billings’ statement that Craig could do sedentary or light duty work. However, Dr. Billings qualified that opinion by also stating Craig was incapable of returning to work on the medication he was taking. Dr. Billings recommended Craig’s medication be reduced or discontinued and saw the need for pain *1063 management. In Johnson v. East Baton Rouge City Parish Government, 408 So.2d 1151 (La.App. 1st Cir.1981) the court affirmed an award of penalties and attorney’s fees on the basis the adjuster failed to consider all of the important facts in denying a claim.
“Whether an employer’s refusal to pay workers’ compensation benefits warrants the imposition of penalties and attorney’s fees is a factual question which will not be disturbed on appeal in the absence of manifest error.” Kortz v. Colt Energy Services, Inc., 97-159 (La.App. 5th Cir. 7/29/97), 698 So.2d 460, 466.
The accident occurred in 1994. The law at the time of the accident provided a different standard for the assessment of penalties from that used to assess attorney’s fees. La. R.S. 23:1201 provided that “Penalties are not to be assessed when the employee’s right to such benefits has been reasonably controverted by the employer or insurer.” Kortz, supra at 467. 114La.R.S. 28:1201.2 provides “that the defendant acted arbitrarily and capriciously and without probable cause before attorney’s fees can be assessed.” Id.
Regarding attorney’s fees, we conclude the trial judge was not manifestly erroneous in concluding the defendants were arbitrary and capricious and without probable cause in refusing to pay for treatment involving pain management as recommended by Dr. Billings. Furthermore, the defendants had no factual nor medical information to counter Dr. Billings’ medical opinion that Craig needed pain management in order to reduce his heavy reliance on. narcotic medication. There is no indication in the record that Craig ever reduced his pain medication sufficient to return to work.
Appellants rely on video tapes made of Craig in 1994 and 1996. The Supreme Court in Orgeron v. Tri State Road Boring, Inc., 434 So.2d 65, 69 (La.1983) held:
evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity.
Appellants contend that the video surveillance tapes taken in the years 1994 and 1996 contradict petitioners’ statements that Craig was unable to move about freely without pain. The trial judge stated for the record that she would admit these tapes into evidence but would give them such weight as she deemed fit. We have reviewed these tapes depicting Craig performing various activities, including mowing the grass. Christine testified at trial that Craig did occasionally mow the grass but only out of necessity. She also explained that when he did so, he did so with pain medication, and then suffered the consequences of increased pain thereafter. We also note that although the video shows Craig assisting in the moving of what appears to be a refrigerator on a hand truck or dolly on June 28, 1994, this court cannot determine from the tape the amount of weight actually held by him while he assisted two other men. We also note that in a segment of tape taken May 26, 1994 Craig appears to be walking with a slight limp in his left leg. The trial judge evidently attached greater weight to Christine’s testimony that Craig did not engage regularly in such activities and that whenever he performed such activity as mowing the grass he was bedridden for days. The trial judge made a credibility determination and we cannot say she was clearly wrong in her findings ofhsfact.
Furthermore, the trial judge correctly noted there were delays in Craig’s having tests recommended by his doctor. There was no disputed medical evidence that Craig did not need the testing recommended by his physician.
The medical record from Oschner was introduced into evidence. There are several quoted statements taken from Craig wherein he stated he was frustrated at the insurer’s delay in providing tests and treatment.
Accordingly, for the reasons stated, the judgment is affirmed at appellants’ cost. Additionally, this court finds that since no specific monetary award was made relative to the compensation, medical expenses, and transportation expenses to which the peti *1064 tioners are entitled, we must remand for further proceedings in the trial court for the trial judge to set these amounts with specificity.
AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.

. Nicole was bom January 7, 1992.

. See discussion on causation infra.