***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence, receive further evidence and to amend the prior Opinion and Award. The Full Commission therefore modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The parties to this action are subject to the Workers' Compensation Act. The Plaintiff was an employee of Harrah's Cherokee Casino.
4. The North Carolina Guaranty Association is now the servicing agent.
5. Plaintiff alleges he was injured during the course of his employment with Harrah's Cherokee Casino on May 26, 2001.
6. Plaintiff's average weekly wage at the time of the alleged injury was $424.63, which results in a compensation rate of $283.09 (by post-hearing stipulation by the parties).
 ***********
Based upon the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was born October 9, 1952, and was previously employed as a Games Technician with Harrah's Cherokee Casino in Cherokee, North Carolina. He began working for Harrah's in September 1998. His job duties included repairing and performing preventative maintenance on the casino's gaming machines.
2. On or about May 26, 2001, plaintiff was lifting a 35-pound monitor from a machine when he felt a sharp pain in his lower back that radiated into his left leg. He did not immediately report an accident or seek medical treatment and continued to work his shift that day before leaving at his scheduled departure time. Plaintiff did not report this specific traumatic incident at that time because he did not think he had a serious injury. The Full Commission finds this testimony to be credible.
3. Plaintiff continued to work with increasing symptoms until the pain became constant and of such severity that he was forced to seek medical attention at Cherokee Hospital on June 26, 2001. Plaintiff was taken out of work by the ER doctor through July 3, 2001. Plaintiff also sought medical treatment from Dr. Karcher, a chiropractor, who continued to keep him out of work. After plaintiff failed to improve with conservative treatment, Dr. Karcher ordered an MRI, which revealed a herniation at L5-S1.
4. Dr. Karcher referred plaintiff to Dr. Jon M. Silver at Mountain Neurology. Dr. Silver performed an L5-S1 laminectomy at Memorial Mission Hospital in Asheville, North Carolina, on September 7, 2001. Dr. Silver then referred plaintiff to physical therapy. Plaintiff requested a work release without restrictions on October 29, 2001, so that he would be allowed to return to work, and returned to Harrah's on October 31, 2001. Although he had been released to work, plaintiff had not been released from medical care and continued to suffer pain.
5. On November 7, 2001, plaintiff called Dr. Silver's office complaining of pain in his left leg similar to that which he had before his surgery. Dr. Silver phoned in a prescription of steroid medication. Sometime around the end of November or beginning of December 2001, plaintiff slipped on ice and fell on a wooden ramp outside his home. Plaintiff recalled being seen and having x-rays taken, but could not recall whether it was at Cherokee Hospital or a walk-in clinic. No records could be located for this incident. Plaintiff's recollection was that the x-rays did not reveal any new injury. On December 13, 2001, Mountain Neurological ordered an MRI and another steroid dose. On December 31, 2001, plaintiff presented at Dr. Silver's office complaining of pain radiating down both legs and reported the slip and fall on ice.
6. Although plaintiff was in increased pain from the slip on ice, he continued to work through December 27, 2001, when Dr. Silver wrote him out of work from that date through February 1, 2002. Dr. Silver also referred plaintiff for epidurals. Due to plaintiff's continuing complaints of pain, Dr. Silver ordered a myelogram, which revealed moderate to severe spinal canal stenosis at L4-5. Plaintiff continued to remain out of work, and Dr. Silver performed a second L4-5 hemilaminectomy on April 22, 2002.
7. Subsequent to his second surgery, plaintiff was kept out of work for a period of time that exhausted his FMLA leave time. Upon the expiration of his FMLA leave, plaintiff was fired by Harrah's for not returning to work. Dr. Silver continued to treat plaintiff for continued low back pain, and ordered another epidural block for low back pain in July 2002. An additional MRI in September 2002 did not show any changes. In January 2003, Dr. Silver recommended a pain specialist for plaintiff. Ultimately, Dr. Silver assigned a ten percent (10%) permanent partial impairment rating to the back on June 9, 2003, and recommended a formal functional capacity examination (FCE) to determine plaintiff's restrictions.
8. As of the date of the hearing before the Deputy Commissioner, plaintiff continued to complain of ongoing severe pain in his lower back that radiated down his left leg, and continued using Percocet for such pain. Plaintiff remained disabled due to his back, and was approved for Social Security Disability. Because he was unable to meet his co-pays with Mountain Neurological, plaintiff has had to change physicians, first through Cherokee Hospital and more recently with Dr. William Miller.
9. Plaintiff related his injury to the lifting incident at work in his initial hospital report, in his history to Dr. Karcher, and in the history given to Dr. Silver. He did not, however, immediately file a workers' compensation action with the employer. Initially, he thought it was a minor injury, and later, he applied for short-term disability, thinking that he had waited too long to file for workers' compensation. However, plaintiff's application for short-term disability was initially denied due to his injury being work related, and he was instructed to file for workers' compensation. The employer completed a Form 19 and Legion Insurance Co. denied plaintiff's claim on a Form 61 filed on September 10, 2001.
10. During the period of disability following his first surgery, plaintiff received short-term disability payments through an employer-funded plan with The Hartford, totaling $4,965.26.
11. Deputy Commission Ledford found, and defendants have not appealed, that plaintiff suffered a specific traumatic incident arising out of the course and scope of his employment with on May 26, 2001, and that plaintiff's failure to give his employer written notice within 30 days of his injury was not a bar to his claim.
12. Plaintiff does not contest the Deputy Commissioner's finding that at sometime in late November or early December 2001, plaintiff fell on an icy ramp outside his home. However, plaintiff had not reached a state of maximum medical improvement prior to his fall, and Dr. Silver's speculative intent to release plaintiff six weeks after his October 29, 2001, office visit was predicated on whether plaintiff was doing well at that time.
13. Asked about the interrelationship between plaintiff's initial injury and subsequent problems, Dr. Silver stated, and the Full Commission finds as fact:
 I think it would make people more — I think it does two things. First, in someone that has what might otherwise be a relatively minor injury or an injury that's more easily recoverable, if you will, having scar tissue in there, having some loss of integrity of the joints, I think makes it more difficult for them to get over a strain type injury.
 Something that someone with a normal spine might get over in a day or two may take months to get over, because there is loss of integrity of the joint space. There is scarring in the area, which tends to irritate nerve roots more.
 So that's one way that I think it definitely does make people more — people are more symptomatic from what would otherwise be a more minor injury after surgery.
 The other thing it does is, by taking down part of the joint and by disrupting ligaments, there is also more of a propensity to develop degenerative changes at that level over time just as any injury to the joint space would be; a football injury or fall. So over time I think they are more prone to develop degenerative changes.
 The long [sic, short] answer to your question is, yeah, I think there are two ways and the answer is yes.
 I think that having an injury to the back after a surgery certainly is likely to result in worse symptoms than having not had the surgery.
14. While Dr. Silver opined at his deposition that the second surgery was primarily to correct degenerative changes, he did indicate that changes seen on the MRI relating to scarring and fibrosis around the nerve were related to plaintiff's first surgery. The report from the April 1, 2002, MRI indicated moderate to severe stenosis at the same level as the earlier surgery due to the prominence of the ligamentum flavum and the scar tissue. Furthermore, Dr. Silver's actual surgery notes reveal several instances of recisioning scar tissue:
 On the left side, I used the angled and straight curets to dissect scar tissue and dura from the undersurface of the bone and then removed the bone in a similar fashion with the Kerrison rongeurs. Thickened ligamentum flavum was observed bilaterally. At this point, the operating microscope was brought onto the field. Utilizing microdissection techniques, the thickened ligamentum flavum was dissected free from the dura bilaterally utilizing great care on the left side because of the scarring and as I dissected the ligamentum flavum free, it was removed with the Kerrison rongeurs. The Kerrison rongeurs were used to decompress the lateral recess bilaterally until I was flush with the medial aspects of both L5 pedicles. Both L5 nerve roots were identified. They were dissected medially with the black nerve hook, as well as the angled curets and additional ligamentous tissue was removed to completely decompress the cal sac and nerve roots I then inspected the epidural space, first on the right side and there was absolutely no evidence of disc protrusion here. On the left side, I dissected free the scarred nerve root and once the lateral aspect of the nerve root was identified, I used the black nerve hook as well the ball-tipped nerve hook to explore the disc. There did not appear to be any disc material, only some mild scar tissue here. I did use the downbiting curets to bring some mild disc bulge down into the disc space and this was removed with pituitary rongeurs."
It is clear from this description that in addition to the degenerative changes to plaintiff's ligamentous flavum, the second surgery involved the removal of scar tissue from the first surgery.
15. As has already been found as fact above, plaintiff's first surgery would have made him more prone to develop degenerative changes, specifically ligamentous changes. The ligamentum flavum Dr. Silvers removed is a primary spinal ligament, and was identified, along with the scarring, as a primary cause of the stenosis seen on the April 1, 2002, MRI.
16. Although plaintiff had not been released by Dr. Silvers, plaintiff conceded that he had returned to work from October 31, 2001, through December 27, 2001, and that such return would most likely rebut his ongoing presumption of disability. As such, the burden of proving disability under N.C. Gen. Stat. § 97-2(9) for the period subsequent to December 27, 2001, would return to the plaintiff. Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993). The Deputy Commissioner did not address that issue, as her Opinion and Award did not find a causal relationship between plaintiff's compensable injury and treatment received subsequent to December 31, 2001.
17. The fact that Dr. Silver assigned a permanent partial impairment rating on June 9, 2003, is irrelevant to plaintiff's entitlement to continuing temporary total disability compensation, and, in fact, it should be pointed out that the rating was provided at counsel's request to assist in case evaluation prior to mandatory mediation. Although Dr. Silver indicated that he did not feel that there was anything else he could do for plaintiff, he indicated that plaintiff's activities would be limited by his pain. Additionally, plaintiff testified at some length regarding the debilitating effect his pain is having on his activities of daily living and, by extension, his vocational ability.
18. Once plaintiff reestablished his disability when Dr. Silver took him back out of work in December 2001, the burden was again shifted back to defendants. Moreover, plaintiff's entirely credible testimony regarding his condition, history of continuing medical treatment, and qualification for Social Security Disability go far beyond mere presumptions in proving the ongoing nature of his disability and its direct link to his compensable specific traumatic incident.
19. Plaintiff was paid short-term disability benefits under an employer-funded plan. Defendants would be entitled to a week-by-week credit for any benefits plaintiff received under this plan against any compensation for disability that may be due.
20. Plaintiff also purchased his own supplemental insurance through AFLAC. Since plaintiff paid these premiums, defendants would not be entitled to a credit for any benefits plaintiff has received from AFLAC.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On or about May 26, 2001, plaintiff sustained a specific traumatic incident, arising out of and in the course of his employment with Harrah's Cherokee Casino. As a consequence, he injured his lower back, sustaining a herniated disc. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's failure to give his employer written notice of his claim within 30 days of his specific traumatic incident is not a bar to his claim, where plaintiff did not realize the seriousness of his injury and had not sought any medical treatment. Plaintiff gave his employer actual and written notice within a reasonable time after he first sought medical treatment. The employer has not been prejudiced. N.C. Gen. Stat. § 97-22;Jones v. Lowe's Companies, Inc., 103 N.C. App. 73 (1991).
3. As a consequence of his back injury, plaintiff required medical treatment, including the surgery performed by Dr. Silver on September 7, 2001, and the second surgery, performed on April 22, 2002. Defendants are responsible for payment of all such reasonably necessary medical treatment incurred by plaintiff for the lower back injury, including said surgeries, and follow-up to those surgeries. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
4. As a consequence of his back injury, plaintiff was unable to earn wages in any employment and was temporarily totally disabled from June 26, 2001, through October 31, 2001, and from December 27, 2001, and continuing until plaintiff is able to earn the same or greater wages as he was earning when first injured. Defendants are responsible for payment to plaintiff of wage loss compensation at the rate of $283.09 per week during this period. N.C. Gen. Stat. § 97-29.
5. Defendants are entitled to a week-by-week credit against any compensation due for wage loss for benefits paid to plaintiff under the employer-funded short-term disability plan. Defendants are not entitled to a credit for any benefits paid to plaintiff by AFLAC, which premiums were paid by plaintiff. N.C. Gen. Stat. § 97-42.
6. Also at issue is whether the fall that plaintiff suffered outside his home in late November or early December 2001 was an intervening causal event sufficient to bar plaintiff from further compensation. For this to be the case, any injury resulting from his fall would have to be entirely independent of the compensable injury. See Heatherly v.Montgomery Components, Inc., 71 N.C. App. 377, 380, 323 S.E.2d 29, 30
(1984). The Deputy Commissioner appeared to apply a requirement in her Finding of Fact 13 that plaintiff's fall itself was causally related to his compensable injury. Plaintiff has not made that claim, nor is that the appropriate standard. The Court of Appeals held in Horne v. UniversalLeaf Tobacco Processors, 119 N.C. App. 682, 459 S.E.2d 797 (1995):
 The aggravation of an injury is compensable if the primary injury arose out of and in the course of employment, and the subsequent aggravation of that injury is a natural consequence that flows from the primary injury. Citing: Heatherly v. Montgomery Components, Inc. 71 N.C. App. 377, 379, 323 S.E.2d 29, 30 (1984). Unless the subsequent aggravation is the result of an independent intervening cause attributable to claimant's own intentional conduct, the subsequent aggravation of the primary injury is also compensable. Citing: Roper v. JP Stevens Co., 65 N.C. App. 69, 73, 308 S.E.2d 485, 488 (1983). An `intervening cause' in the context of the Workers' Compensation Act is an occurrence `entirely independent of a prior cause. When a first cause proceeds a second cause that produces a result, the first cause is a cause of that result (emphasis added) (citing Heatherly v. Montgomery Components, Inc., 71 N.C. App. 377, 380, 323 S.E.2d 29, 30 (1984) (quoting Petty v. Transport, Inc., 276 N.C. App. 417, 426, 173 S.E.2d 321, 328 (1970)).
Horne at 685, 799. In the case at hand, plaintiff had an L5-S1 diskectomy at Mountain Neurological performed by Dr. Jon M. Silver on September 7, 2001. At his request, plaintiff had been released back to work on October 29, 2001. Plaintiff's next scheduled follow-up was to be six weeks subsequent, but with instructions to call if he had any problems. On November 8, 2001, prior to his fall at home, plaintiff called Dr. Silvers to report pain returning to his left leg similar to before the surgery. The slip and fall on ice aggravated the earlier injury and the pain and medical consequences were a natural progression of the earlier injury.
7. There has been no allegation that plaintiff's slip and fall on the ice was in any way of his own volition. Referring again to Horne, the Court said:
 [E]ven assuming arguendo, that the automobile accident was an independent intervening cause of plaintiff's disability, we find no evidence in the record that the accident was attributable to plaintiff's own intentional conduct. See Roper v. JP Stevens Co., 65 N.C. App. 69, 308 S.E.2d 485 (1983); and Starr v. Paper Co., 8 N.C. App. 604, 175 S.E.2d 342 (1970). An aggravation of a compensable injury is also compensable, `unless it is the result of an independent, intervening cause attributable to claimant's own intentional conduct.' Roper v. JP Stevens Co., 65 N.C. App. 69, 73, 308 S.E.2d 485, 488 (1983).
Horne at 687, 800-01.
8. With regard to plaintiff's continuing inability to earn wages, the Court of Appeals affirmed a series of earlier holdings which have held that "medical evidence that a plaintiff suffers from genuine pain as a result of a physical injury, combined with the plaintiff's own credible testimony that his pain is so severe that he is unable to work, may be sufficient to support a conclusion of total disability." Knight v. Wal-Mart,149 N.C. App. 1, 7-8, 562 S.E.2d 434, 439, 440
(2002); see also Webb v. Power Circuit, Inc.,141 N.C. App. 507, 512, 540 S.E.2d 790, 793 (2000);Barber v. Going West Transp. Inc., N.C. App. 428,517 S.E.2d 914 (1999); and Matthews v. Petroleum TankService, Inc., 108 N.C. App. 259, 423 S.E.2d 532
(1992). The Knight court also held that the concept of maximum medical improvement (MMI) is not relevant to the determination of entitlement to the continuation of temporary total disability (or TTD) benefits. Knight at 10, 441.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay for all reasonably necessary medical treatment incurred by plaintiff for the lower back injury he sustained on or about May 26, 2001, including the surgeries performed by Dr. Silver in September 2001, and on April 22, 2002, and the post-surgical follow-up treatment from both surgeries, so long as such treatment was intended to effect a cure, return the plaintiff to work, or to ease pain.
2. Subject to attorney fees set forth below, defendants shall pay plaintiff compensation for wage loss at the rate of $283.09 per week from June 26, 2001, through October 31, 2001, and from December 27, 2001, through the filing date of this Opinion and Award and continuing until plaintiff is able to return to work at his former wages and until further order of the Industrial Commission. Defendants may take an appropriate week-by-week credit for benefits paid to plaintiff under the employer-funded short-term disability plan. The amounts through the date of payment in compliance with this Opinion and Award have accrued and shall be paid in a lump sum. Thereafter defendants shall pay $283.09 weekly to plaintiff, with every fourth check going directly to plaintiff's counsel. Of the lump sum, defendants shall pay three-fourths to plaintiff and one-fourth directly to plaintiff's counsel as reasonable attorney fees. Defendants shall pay interest at eight percent (8%) per year to plaintiff.
3. Defendants shall pay the costs.
This 18th day of May 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER